## Lee Simonson et al., Plaintiffs, v. Theresa Helburn et al., Defendants.

Supreme Court, Special Term, New York County, May 17, 1950.

*Irving S. Ottenberg, J. George Levy* and *T. Girard Wharton* for plaintiffs.

*Benjamin M. Kaye* and *Milton Kunen* for Theresa Helburn, defendant.

*Theodore Kiendl* for Lawrence Langner, defendant.

*Bertram A. Mayers, H. W. Fitelson* and *Harold J. Sherman* for Theatre Guild, Inc., defendant.

*George A. Spiegelberg* and *Walter J. Freid* for Maurice Wertheim, defendant.

*Samuel J. Silverman* for Warren P. Munsell, defendant.

GAVAGAN, J. This is a declaratory judgment action in which the plaintiffs seek to have a stockholders' agreement declared illegal. In addition they ask the court for coercive relief re-establishing the ownership interests in the corporation as they existed prior to the agreement.

The agreement was executed on January 7, 1941. At that time the distribution of stock in the Theatre Guild, Inc., was as follows: The plaintiffs or their predecessors in interest and the defendants Langner, Helburn and Wertheim each owned 1,000

shares of nonvoting 6% preferred and one share of common; the defendant Munsell owned 250 shares of preferred and no common. All the stockholders except Munsell signed the agreement but Munsell voluntarily gave up his 250 shares.

The substance of the agreement may be summarized under five headings:

1. A change in the capital structure and ownership interests in the corporation;
2. Employment of defendants Langner and Helburn;
3. Restrictive covenants upon the sale of stock, provisions for the distribution of assets upon sale or liquidation, and provisions for dissolution upon the happening of certain events;
4. Employment of the plaintiffs;
5. Restrictions on management.

Plaintiffs' fundamental contention is that the agreement sterilized the board of directors (*McQuade* v. *Stoneham,* 263 N. Y. 323 [1934], motion for reargument denied 264 N. Y. 460 [1934]; *Long Park* v. *Trenton-New Brunswick Theatres Co.,* 297 N. Y. 174 [1948]; General Corporation Law, § 27; but see *Clark* v. *Dodge,* 269 N. Y. 410 [1936]).

It is not claimed that what was done under the first heading is itself illegal, yet the reorganization was the central point of the bargain and remains the central objective of this action. It is difficult to appreciate the position that the plaintiffs take without a full appraisal of the business considerations which led up to the corporate reorganization and the nature of the reorganization itself.

With the approach of the 1939 theatre season, the guild found itself on the verge of financial failure. This resulted in part from the depression, but to a considerable extent was caused by internal dissension among the six stockholders, who also constituted the board of directors. They could not agree on plays to be produced, actors or directors to be employed, etc. At this time, Mr. Barry offered the guild his play, " The Philadelphia Story ", on condition that the defendants Langner and Helburn were to have complete charge of its production. The spectacular success of that venture, as well as other successful plays produced under the same guidance and control, led to the six-party agreement.

The purpose of the agreement was to solidify and perpetuate this arrangement so that the talents of Mr. Langner and Miss Helburn could be made effective for the benefit of the corporation. Although somewhat alleviated, the financial condition of

the guild was still serious. A disputed bondholders' claim for about $375,000 had been asserted and was later settled for $120,000. In addition, the guild owed about $45,000 in back salaries. Furthermore, the working capital of the corporation had not reached a level of reasonable security, considering the speculative nature of the business. In view of these obligations, the stock interests were worth very little. The bondholders' committee exerted considerable and justifiable pressure in favor of the agreement.

With this situation before them, the plaintiffs knew they were getting out. The only question was how much they could salvage in the process. Their sole bargaining weapon was the power to insist on their legal rights as stockholders and directors and thus bring foreclosure and bankruptcy on the enterprise. This power had trading value, and, represented by able counsel, these plaintiffs got all that it was worth.

The agreement provided that all stock was to be turned back to the corporation, except that the defendants Langner, Helburn and Wertheim were to retain one share of common stock each. The plaintiffs were then to receive seventy-five shares each of new 5% noncumulative, nonvoting preferred stock. The board of directors was to be reduced from six in number to three. This capital reorganization, promised in the agreement, was subsequently effected by corporate action at stockholders' and directors' meetings, held on December 9, 1941.

The virtue of the agreement is the fact that such management provisions as may be read into its terms are fairly reflected in the new capital structure of the corporation. Control ordinarily goes with the common stock; and pursuant to the agreement, the common stock kept control. Likewise, management resides in the board of directors; and pursuant to the agreement the individuals constituting an absolute majority of the board of directors in fact managed the corporation. As preferred stockholders, the plaintiffs are little more than debenture holders. *They neither control nor manage because they have sold or exchanged their controlling interest.*

Here lies the critical difference between the case at bar and *Long Park* v. *Trenton-New Brunswick Theatres Co.* (297 N. Y. 174, *supra*) upon which the plaintiffs chiefly rely. (See, also, *Matter of Abbey* [*Meyerson*], 274 App. Div. 389 [1948], affd. 299 N. Y. 557, following the *Long Park* case.) In the *Long Park* case the agreement provided for management and control of the corporation by *one class of common stockholders.* The

reorganization was purely formal; there was no attempt to effect a fundamental change in capital structure. Each stockholder retained the same ownership interest that he had prior to the agreement, yet Keith obtained by way of a management contract, which vested in it as class A stockholder, exclusive control over important aspects of the corporation's business. The broad powers held by Keith for a term of nineteen years were not a reflection of Keith's power on the board of directors: the board remained deadlocked after, as before, the agreement.

Plaintiffs here, however, are seeking to upset an agreement effecting a complete redistribution of the common stock, which placed ownership in the hands of the management. The desire to give Langner and Helburn control was successfully effected by conveying to them a majority of the common stock and providing that "All the voting power will reside in the common stock and through its exercise the common stockholders will elect the Board of Directors and have absolute control over management." Thus, by electing the board of directors, the common stockholders control management. This is in accord with the statutory scheme and cannot justly be held to violate section 27 of the General Corporation Law.

The capital reorganization of the guild, which distinguishes the transaction from the *Long Park* case (*supra*) is only significant in relation to the second principal provision of the six-party agreement — i. e., the employment of Langner and Helburn.

The agreement provides in paragraph 8 that Miss Helburn and Mr. Langner shall have written contracts " covering their compensation for their present duties as Administrative Directors of the Theatre Guild and requiring them to use their best efforts to get opportunities for the Guild and each of them agrees to make such a contract for at least one year."

This clause does not explicitly grant any management powers whatsoever to the administrative directors. There is an oblique reference to " compensation for their present duties," which may fairly be interpreted to extend those duties into the contemplated employment contracts. But under the informal arrangement existing at the time of the agreement (to which the phrase " present duties " refers) the power of the board remained intact. Important *duties* were imposed upon Langner and Helburn as administrative directors, but the board retained *power* to withdraw those duties whenever it saw fit. Perpetuating that relationship between the full board and its executive

employees cannot justly be construed as a violation of section 27 of the General Corporation Law.

A comparison of the above employment clause with the management provisions under scrutiny in the *Long Park* case (*supra*) illustrates the wide disparity in the two agreements. There the contract provided: " The Manager is hereby given full authority and power to supervise and direct the operation and management of all such theatres and *in furtherance and not in limitation of the foregoing,* it shall have power and authority to buy and book all features, short subjects, newsreels and other motion pictures, stage shows, personal appearances, television and other attractions and entertainment to be exhibited, played or performed in the theatres; to designate and, from time to time, to change the entertainment policy and scale of admission prices; to select, engage, supervise and direct and discharge any and all necessary employees or personnel for each of said theatres; to maintain the theatres in good operating condition; to do any and all other acts and things which are customary in connection with the management of theatres; and to carry out such policies or projects as the Board of Directors of the Tenant or its subsidiaries may approve." (Italics added.) (*Long Park v. Trenton-New Brunswick Theatres Co.,* 297 N. Y. 174, 177–178.)

No such specific grant of broad managerial powers is contained in the agreement which is the subject of this action. But the plaintiffs have sought to bring the facts of their case within the principle of the *Long Park* case (*supra*) by directing the court's attention to certain by-laws of the corporation. It is clear that the plaintiffs have no standing here to complain of by-laws enacted when they were mere holders of nonvoting preferred. The relief they seek depends exclusively upon the illegality of the agreement.

The contention is, however, that the by-laws which were enacted on December 9, 1941, throw considerable light upon the real purpose of the agreement executed eleven months earlier. All facts tending to vitiate the board's authority are said to constitute a single transaction which, viewed as a whole, transgresses the mandate of the statute. (See *Matter of Abbey* [*Meyerson*], *supra.*)

But even assuming the validity of this subsidiary question of relevancy, the plaintiffs cannot succeed. Subdivisions (b) and (c) of section 6 of article III which define the functions of the administrative directors, provide as follows:

" (b). The said two Administrative Directors shall be vested with full executive authority and duties to operate the Corporation in conformity with the policies of the Board of Directors and shall handle the day-to-day problems arising in connection with the administration of the affairs of the Corporation and the employment of its administrative staff. The said two Administrative Directors shall also be vested *exclusively* with the duty and authority to select plays to be produced by the Corporation, alone or in combination with others; the selection and terms of employment of actors and members of the cast for plays to be produced; the directors and producers of said plays; the scenic artists and compensation to be paid to such actors, scenic artists, directors and producers of plays.

" (c). The joint and *unanimous* decisions of the two Administrative Directors shall be required in order to make effective the action and decisions of the Administrative Directors." (Italics added.)

The simple grant of executive power contained in the first sentence of subdivision (b) cannot effect a sterilization of the board for that power is expressly to be exercised in conformity with the policies of the board. The second sentence, however, does grant exclusive power to the administrative directors to select and produce plays which constitute the principal business of the corporation. This contains the heart of the plaintiffs' case. In discussing it, I am still assuming that it can be read back into the six-party agreement.

Since the agreement contemplated that Mr. Langner and Miss Helburn were not only to be the two administrative directors but two of the three members of the board as well, the by-law in question provides in effect that no play can be produced unless approved by a majority of the board. This required approval constitutes legally sufficient control by the board for it has long been recognized in New York that the directors of a close corporation, when few in number, and in frequent contact with each other may act effectively without going through the useless formality of convening as a board (*Matter of Doelger*, 254 App. Div. 178, 186–187 [1938], affd. 279 N. Y. 646).

It is only in the hypothetical situation not contemplated by the agreement, where the administrative directors do not constitute a majority of the board that the plaintiffs' contention has some force. Aside from the extreme unlikelihood of such a situation, it is within the power of the board to select administrative directors, and it can retain in such employment contracts sufficient control of the executives. At least for the pur-

poses of this action, I cannot assume that the board would act illegally, or if it should, that such illegality was contemplated by the six-party agreement. From all that appears in the by-law, the board could employ administrative directors at will, and thus retain ample control.

Two other points raised by the plaintiffs may be briefly disposed of together. The first involves a provision of the agreement which gives to the plaintiffs and Mr. Wertheim the absolute power individually to dissolve the corporation upon the resignation of both Miss Helburn and Mr. Langner. It is claimed that this absolute right is illegal since the power to dissolve a corporation, even by a majority, is subject to the equities existing at the time. (*Kavenaugh* v. *Kavenaugh Knitting Co.*, 226 N. Y. 185 [1919].)

The second involves provisions of the agreement which commit the guild to hire the plaintiffs at substantial salaries as an '' Advisory Board '' without imposing any obligation to render services. This, it is claimed, is a waste of corporate assets.

As to both contentions, the remedy traditionally lies in equity either by way of a stockholders' action or through the actual petition for dissolution; and in both proceedings equitable defenses would be recognized. The plaintiffs have received their salaries, and the power to dissolve was given to them. It ill behooves them to point to these provisions, made for their benefit, as a reason for upsetting the whole agreement. Furthermore, I cannot assume that these plaintiffs will exercise their right to dissolve in circumstances where it would not be in the best interest of the corporation. The very case they cite (*Kavenaugh* v. *Kavenaugh Knitting Co., supra*) establishes the existence of a fiduciary relation among the members of a corporation. Fidelity to that obligation will be implied in the agreement in order to uphold its validity. Since the plaintiffs here are seeking equity I must assume that when the time comes they will be willing to do equity.

Nothing that is said here is contrary to the *Long Park* case (*supra*) where the court rejected, *sub silentio,* the equitable defenses presented. The sole question there was whether the agreement violated the *legal* command of a statute. The two points here raised are equitable in nature and subject to equitable defenses.

The plaintiffs attack still other provisions of the agreement. One of these assures Langner and Helburn one third each of the net profits from guild enterprises which extend beyond the narrow field of New York theatre. Another permits Langner

and Helburn to engage in personal ventures, provided the question of competition with the guild is first passed upon by an umpire. The umpire may take into consideration the question of whether the proposed venture involves plays of " Guild standard ". These provisions are said to constitute a waste of assets and to sanction divided loyalty. The theory is that the enormous commissions (which were to be reduced from one-third to one-fourth after May 1, 1948) tempt the administrative directors to divert guild energies away from the theatre toward radio, television and motion pictures. The arbitration clause is thought unduly to restrict the guild to " Guild standard " plays by permitting competition by Langner and Helburn in other fields.

But both provisions are plainly harmless. The payment of substantial commissions is a matter of business judgment with which courts should not interfere — at least in the absence of fraud or overreaching and where neither creditors nor the public are injured. In *Clark* v. *Dodge* (269 N. Y. 410, *supra*) the plaintiff was promised one fourth of the total profits for life as manager of the corporation and the contract was sustained. Furthermore, Langner and Helburn would ordinarily be entitled to one third of the net profits by virtue of their common stock holdings. The provision in question merely gives them priority over preferred dividends with respect to one segment of the guild's business. Since the plaintiffs took their stock with full knowledge of, and subject to, the six-party agreement, they cannot complain.

The arbitration provision is certainly a valid and commendble device for determining any question of divided loyalty before harm occurs. It is intended to bring such issues into the open where they may be aired before an impartial tribunal, to prevent the possibility that secrecy or betrayal of fiduciary obligations may later be asserted. The norm of " Guild standard " plays merely establishes one measure for the umpire's guidance and is not intended to be the exclusive standard.

Other provisions which restrict the management against risking the last $15,000 of working capital and prevent the board from reappointing Langner or Helburn as administrative directors after they have once resigned without first obtaining the plaintiffs' consent — if they do conflict with section 27 — constitute so slight an infringement as to be innocuous. (See *Clark* v. *Dodge, supra,* as discussed in *Long Park* v. *Trenton-New Brunswick Theatres Co., supra.*)

Judgment is directed to be entered in favor of the defendants Langner, Helburn, Wertheim and the Theatre Guild, with costs. The claims of the defendant Munsell based on his alleged ignorance of the facts of the transaction are likewise dismissed. It is clear that he knew what transpired and surrendered his stock of his own free will.

All motions made at the trial upon which decision was reserved are denied insofar as they are inconsistent with this opinion.

This is intended as a complete decision rendering unnecessary further findings of fact and conclusions of law.

Settle judgment accordingly.