Charles A. Loreto, J.
Petition pursuant to section 964 of the Penal Law of New York seeking to enjoin respondents from using the name “Hungarian Freedom Fighters Federation, Inc.,,
Petitioner was organized as a membership corporation under the New York Membership Corporations Law in March, 1957.
It is claimed that the respondents Samson and Potoczky have no official connection with the organization and are unlawfully promoting and advertising charter plane flights, using its name as sponsor. The petition is signed by one Bela Kiraly as its president.
On submission of the petition and the cross application for an injunction, the court stated in its decision that from a reading of the affidavits and exhibits submitted it was not clearly established who of the contending individuals had a standing as director or officer to seek the relief requested on behalf of the corporation and, therefore, the court directed an early trial of the issues raised.
As adjournments were requested by the attorneys for the parties because of the absence of one or another from the country, the trial of this matter was not held until recently.
The dispute is essentially one between Bela Kiraly on the one hand and Joseph Samson with other Hungarian refugees on the other. Kiraly asserts that Samson has no standing in the organization because he was not elected as one of its directors at a meeting of the board on May 5,1959. Samson contends that he was duly elected director on that date, has been serving as such to the present time and moreover, at a meeting of the board duly held on February 20,1960 Kiraly was expelled as a member of the corporation and removed as a director and officer and therefore that he lacks the right to speak in behalf of the corporation and to institute this proceeding.
The certificate of incorporation of petitioner recites its purposes to be:
“ (A) To work toward the restoration of freedom, human rights and independence in Hungary, as well as to encourage and further individual and national freedom in all Europe, and elsewhere by the use of all peaceful means whatsoever including, without limitation, the exertion of moral forces and other forces, and by keeping the people of Hungary accurately informed of world events through any media of communication.
“(B) To help Hungarian exiles and refugees to maintain themselves in useful occupations during their absence from their homeland, and to come to know the people of the United States and other free nations; and to make available facilities whereby *356 such exiles and refugees can contribute to the cause of Hungarian freedom ;
“ (C) To perpetuate the spirit and ideals which motivated the Hungarian Freedom Fighters in the defense of their homeland, and to ensure that the memory of the deeds and courage of the Hungarian heroes be preserved: ’
Also it is authorized to solicit and receive funds for its objects and purposes.*
It was approved by a Justice of the Supreme Court of New York on March 5, 1957. Its subscribers are Kiraly, one Green-lee, a New York attorney, and four other persons of the latter’s office. Kiraly is the only subscriber who is Hungarian.
Kiraly was a general in the Hungarian Army before his country fell under the yoke of Soviet Russia. Samson was a member of the Hungarian Bar and a practicing lawyer in Budapest. These protagonists charge each other with attempting to use the organization for personal aggrandizement and selfish purposes. What they have to say about their personal histories in Hungary prior to having come to this country is of a moving and telling nature. It is charged with much appeal and intimates possible danger to the cause of the organization. The nature of the revelations is such that it is better to give it in their words rather than to attempt to restate it, as will be presently seen.
Samson says in his affidavit verified April 9, 1960:
During the early stages of the communist seizure of Hungary, I was convicted by the puppet Soviet regime of having participated in espionage both for the United States and for Israel. As a result of such conviction, I was sentenced to imprisonment for life and actually was incarcerated for five and a half years. My wife was likewise convicted of similar charges and spent three years in jail. It pains me to reveal that my son was born while my wife was a prisoner.
Prior to that and during the Second World War, I had been a part of the active Underground fighting against Naziism.
In common with many other of my compatriots, I escaped from Hungary because I realized that, as an enemy of the communist regime, my life was in constant danger so long as I remained in the country of my birth.
*357 I was among those fortunate to be given refuge in United States and I arrived here on January 13, 1957. It was only natural that I would find myself a member of the Hungarian community in New York and that I would continue to press the fight against the communist regime in Hungary, and I naturally gravitated toward the organization which is the petitioner.
My work on behalf of the Hungarian freedom fighters, inc., must have been favorably received because it was not too long until I was immersed in the activities of the petitioner and I was invited to become a director and a member of its management. My sponsor in this movement, ironically enough, was the same bela kiraly who now makes these fantastic charges against me.
Prior to World War II, kiraly was notorious as a Nazi leader. In fact, he was convicted by the Allies as a war criminal when World War II was over. Thereafter, since it suited his purposes, he became a leader in the Hungarian Communist Party. His conduct while in Hungary was so notorious that even the New York Herald Tribune has branded kiraly as an ex-communist chief.
It was through his sponsorship that on May 5, 1959, at a meeting called by him, I was honored by being elected to its Board of Directors. If it seems strange that I accepted the sponsorship of a man so widely despised and hated by all freedom-loving people as an enemy of their aims and aspirations, it was only because the ultimate that I could do for our fight for freedom permitted me to overlook the means by which I was enabled to join the fight.
A photocopy of the minutes, of the meeting of May 5, 1959 are annexed hereto, marked Exhibit “ 1 ”, and are made a part hereof. It will be seen that my election was legal and that a quorum was present.
After my election as a Director of the petitioner, I threw myself into the work being carried on by the petitioner with even greater enthusiasm and absorption; and it was in connection with that work that I left for Europe on August 18, 1959 and thereafter returned to New York on October 30, 1959.
I must state categorically that the principal reason for the schism which developed between bela kiraly and the other leaders in our movement was the plain and unadorned fact that bela kiraly is so steeped in the philosophy of dictatorship and self-aggrandisement that he intended to run the operations of the petitioner as its sole manager. This dictatorial approach by Mr. Kiraly was precisely the type of thing that I and the other Freedom Fighters who had fled from Hungary had been resisting for these last years; but joining him in the work of the petitioner was the only means left open to us to carry on our work.
General Kiraly in his affidavit of April 21, 1960 states :
In reference to the malicious and vicious charges which Mr. Samson makes regarding my character and background in his Affidavit, specifically to the charge that I was notorious as a Nazi leader and a leader in the Hungarian Communist Party, I feel it necessary to repeat my denial of such charges. Furthermore, I wish to state that I am an honorary member of the staff and faculty of the United States Army Command and General Staff College, the Senior Tactical School of the United States Army and a photostat of the certificate presented to me by the College is attached hereto as Exhibit “ A ”. I also wish to refer the Court to the record of the consultations between myself and Mr. Joseph ICovago with the Committee on Un-American Activities of the House of Representatives, 86th Congress, 1st Session, dated September 10, 1959, concerning “ The Crimes of Khrushchev ”, annexed hereto as Exhibit “B”. As a matter of fact, the charges directed against me by Mr. Samson are identical to the charges directed against me by the present Hungarian Communist Government in a so-called “white book” which denounces the *358 1956 Hungarian Revolution and its leaders including myself. Furthermore, Mr. Samson’s charges have been repeatedly leveled against me in the daily newspapers of the same Hungarian Communist Government, which Government, according to the United Nations Resolution, is imposed upon the Hungarian people by the Soviet Occupation Forces against the will of the Hungarian people. My participation in the revolution is well documented, and as a matter of fact, is set forth in the reports of the United Nations Special Committee on Hungary. As an example of the absured charges made by Mr. Samson, he repeats his statement that I was convicted by Russia as a Nazi war criminal.
I was never before any Russian tribunal for any sort of crime. I was, in fact, arrested on August 17, 1951 by the Hungarian Communists and paroled September 5, 1956, after five years and one month of imprisonment.
At present I am not only President of the Hungarian Freedom Fighters Federation, Inc., but I work in the other exile organizations of democratic character which are carrying out struggles for the liberation of their nations enslaved by the Soviet Union and local Communists. These exile organizations of high moral and political prestige are the Hungarian Committee and the Assembly of Captive European Nations. I am a member of both and I am the Chairman of the Political Committee of the latter.
In a supplemental affidavit of April 19, 1960, Samson states:
5. Mr. Greenlee in his affidavit and Mr. Kiraly in his seem to be disturbed by what they call “ libelous and insulting remarks ” concerning General Kiraly made by me in my principal affidavit. These remarks were not made with malice but were made for the sole purpose of emphasizing the true atmosphere of this ease. In my affidavit I have referred to Mr. Kiraly as having been notorious as a Nazi leader and later a leader in the Hungarian Communist Party. I cannot understand why Mr. Kiraly takes umbrage at my characterizing him as a leader in the Hungarian Communist Party in view of his letter contained in his so-called “ Progress Report ” of between December 10, 1959 and March 1, 1960. In that report, in a letter to Mr. Philip Cook of the New York Herald Tribune, dated February 8, 1960, the lead sentence in the fourth paragraph thereof is a follows: “ It is a fact that I had been a member of the Hungarian Communist Party.” In the fifth paragraph in that letter he says that he was never a convinced “ Communist ”, whatever that may mean. In any event, the high position which he held in the armed forces of the Hungarian Army during the present Communist regime could mean only that he was fully in the trust and confidence of that regime and was an integral part thereof. It would be interesting to examine into the role played by Mr. Kiraly in the bloody uprising in Hungary that commenced on October 23, 1956 and terminated in rivers of blood shed by Hungarian patriots on October 28, 1956. Mr. Kiraly had himself admitted into a Budapest Hospital as a patient for some supposed ailment or another on October 20, 1956 and he remained there as such a patient until either October 28th or October 30, 1956, a date on which it was convenient for him to leave the hospital since the bloodiest part of the hostilities was over. While it may seem harsh to so state, and I feel I have a right to make this statement because I was in the thick of the fighting during the unsuccessful revolution, Mr. Kiraly, the self-styled hero, took no part in the fighting whatever either on the side of the patriots or on the side of his Communist cohorts and employers.
Mr. Kiraly takes issue with my statement that he was a convicted Nazi, claiming that he was jailed for 5 years by the very Communists whose brother he later became. The charge which I make is amply established when the Court *359 stops to consider that after World War 2, the Western Allies’ sphere of influence was bounded on the east by western Germany and the Russian sphere of influence was eastward of that point. So that while the Western Allies were trying the Nazi war criminals in Germany proper, Mr. Kiraly was tried as a Nazi war criminal by our former ally, Russia, and he was duly convicted of the charge, although even I deplore the make-up of the Court which convicted him. Lest surprise be expressed that the same man can be called a Nazi and a Communist at one and the same time, it should be noted that Europe in general, and Hungary in particular, is over-run with persons of totalitarian philosophy who will embrace any form of totalitarianism, be its name Nazi or Communist, since both of these philosophies spring from one and the same source.
It is of interest to note that, in his indignation, Mr. Kiraly in his reply affidavit says that he was sentenced to prison in 1952 by the Hungarian Communist Secret Police and that he was their prisoner for 5 years. What I cannot understand is that if he was condemned in 1952 and spent 5 years in prison, how was he able to lead the 1956 uprising which was less than 5 years after the time he was jailed?
The court is in no position to determine the accuracy or truth of the assertions quoted from the affidavits of Samson and Kiraly. However, they would cause one to become acutely sensitive of the possible grave danger if the organization is used as the tool and instrument by persons not motivated by its pure and noble aims.
The court finds that from the time of its formation to May 5, 1959 when Samson was named as a director, no members were brought into the organization in addition to the original subscribers. It was under the complete domination and control of Kiraly. Greenlee as attorney for the corporation acted at Kiraly’s bidding and direction. Samson asserts that $120,000 received by Kiraly for corporate purposes has never been accounted for by him. Testimony has been adduced and not refuted that since Samson was named director about 1,500 Hungarian exiles have become members of the organization and have been receiving notices as members.
With this background, the court now turns to the legal problems presented. By section 25 of the General Corporation Law, it is required: “ Upon the application of any member aggrieved by an election * * * [to] hear the proofs and allegations of the parties, and confirm the election or order a new election, as justice may require.” (Italics supplied.)
The corporate minutes recite that a meeting of the board of directors of the organization was held on May 5, 1959, that Bela Kiraly and Vilmos Vass constituting a majority were present, that Vass resigned and Samson was elected as a member and director. The minutes are signed by Bela Kiraly as secretary *360 of the meeting, Greenlee, the third director, testified that he knew of the purpose of the meeting and that he had agreed to it and had signed a waiver of notice of meeting. ■
Kiraly contends (and the petition must be realistically treated as his rather than the organization’s) that the meeting never physically took place. The court so finds. He argues that the collective authority of the directors, acting as a board, is necessary to bind a corporation by the acts of its directors, that, even if they wish to do so, the members may not lawfully turn the board’s general powers over to an individual. Authority is found for such reasoning. It is also claimed that there was no quorum present at the meeting as the minutes show that upon Vass’ resignation and before Samson’s election only Kiraly remained as director and that a single director may not hold a meeting or constitute a quorum, citing Mitchell v. Forest City Print. Co. (107 Misc. 709, affd. 187 App. Div. 743).
These contentions are overruled. During the hearing the court expressed its doubt that official approval would have been granted by a Supreme Court Justice of this State for the formation of a membership corporation with this name and these purposes to be the instrument under the total domination and control of one individual. Such an organization wherein only one individual dictates its operation and control, the original subscribers remaining nominal and no new members invited and added to its rolls, would lose its character as a membership corporation even if it were treated as such at the time it was approved. The Attorney-General would have the right to institute a proceeding to revoke its charter and a Justice of the Supreme Court to withdraw its approval.
The court finds that until May 5,1959 the corporation served as the alter ego of Kiraly. The wishes and intentions of the directors were accurately expressed by the minutes of the meeting of May 5,1959 in electing Samson as a director. Therefore, it will not be set aside because of an informality in the manner it was held (Philips v. Wickham, 1 Paige Ch. 590). Moreover, Kiraly is estopped from raising any question as to the legality of Samson’s election. He is not an “ aggrieved” member of the corporation. Also, the corporation, as such, under the facts here found, must be deemed to be subject to the same estoppel. For the statute commands that the court confirm the election or order a new election, as justice may require. Justice would not be served in holding otherwise. The court should strive to see that only the objects of this nonprofit membership corporation are promoted and that it does not become the vehicle for personal use or abuse. (See Matter of Flushing Hosp. & *361 Dispensary, 27 N. Y. S. 2d 207, affd. 262 App. Div. 749, mod. 288 N. Y. 125.)
Moreover, the situation here is quite comparable to that of closed business corporations where it has been held if the directors are few in number and in frequent contact with each other their action, without the formality of convening the board, will be deemed to be valid and binding (Simonson v. Helburn, 198 Misc. 430; Matter of Stylemaster Dept. Store, 7 Misc 2d 207).
In view of the foregoing, it follows that the injunctive relief sought on behalf of petitioner must be and is denied.
Now, turning to what is requested in the affidavit of respondent Samson on behalf of petitioner by way of relief in addition to the denial of the petition, it may be considered as a cross application enjoining and restraining Bela Kiraly from holding himself out as connected with and from interfering with the business of petitioner.
It should be noted that on September 2, 1959 Kiraly and Greenlee as the sole directors purportedly held a meeting of the board of directors of petitioner wherein one of the principal items of business mentioned as transacted is the declaration that Samson had not been legally elected as director on May 5, 1959. Of course that is the question that the court only is empowered to decide and not the interested individuals.
Samson points to a meeting of the board held on February 20, 1960; that notice was duly sent to Kiraly and Greenlee, which they ignored, and that at that meeting they were removed for cause.
Among the reasons given at that meeting for the removal of Kiraly as an officer and from the board were his failure and refusal to account for approximately $120,000 received by the petitioner from March 1, 1957 to August 1, 1957.
Kiraly’s failure as well as Greenlee’s to attend that meeting is understandable in view of the stand they took on September 2, 1959. Also their failure to take issue with Samson’s claim for affirmative relief is probably explicable for the same reason.
In any event, the court is not empowered to grant summary injunctive relief on this cross application made by way of motion only. In a proper case, a temporary injunction may be granted as incidental to permanent injunction sought in a plenary suit. Here no papers have been served in a plenary action for the relief sought against Kiraly and Greenlee. Therefore, the cross motion is denied without prejudice to such appropriate action as may be available. This opinion constitutes the decision and findings of the court.

 The name of the organization and its purposes are of such significance and importance in the world struggle against communism, that it is not inappropriate to set them forth rather fully. It is highly improbable that there is any incident which more generally works a revulsion to communism than a slaughter of the Hungarian people by the Soviet tanks and armaments in their uprising of October, 1956. The recollection of that event might well be a most potent stumbling block to the advance of communism. On this point, John Gunther in his recent book, “ The Scandinavians ” wrote: “ What has hurt the Communist Cause in Denmark more than anything since the war — this is true in the other Scandinavian, countries as well — is Hungary. People, no matter how far to the left, simply could not stomach the massacre of the Hungarian workers by the Red Army ” (New York Herald Tribune, July 18, 1961, p. 6).