Bertram Harnett, J.
The Long Island Board of Realtors, Inc. (called LIBOR) is the principal trade association for real estate brokers in Nassau, Suffolk and Queens Counties. Since 1965, it has been torn by an internal dispute over its activity known as the multiple listing service, sometimes abbreviated as MLS.
MLS is a voluntary property listing service, dealing primarily with residential property, available to LIBOR members who wish to subscribe, pay the requisite initiation fee and agree to be bound by its rules. Subscribers forward all their exclusive listings to a multiple listing service committee (MLC) together with a listing fee. MLC then publishes central listings and circulates them to subscribers who are entitled to attempt disposition of the properties listed. If a sale is made by a subscribing broker, the commission earned is divided between the broker who placed the listing and the subscribing broker who made the sale, and a sales fee is paid to MLC by the selling broker.
This service began in 1960 and has enjoyed phenomenal growth. Its 1970 budget approximated $270,000 out of a total budget for all of LIBOR of some $390,000. Sales of 3,067 MLS-listed properties in 1969, with total prices of $94,000,000, *561 generated $6,000,000 in commissions for brokers and produced $300,000 in fees paid to LIB OB. Plainly, MLS is no small activity.
From the wrangling in these actions, which were jointly tried before the court without a jury, it appears that one faction (the petitioners in Action No. 2) in LIB OB favors MLS and another faction (the plaintiffs in Action No. 1) bitterly opposes it. Fundamental disagreement as to the philosophy and style of real estate brokering, as well as personality differences, figure prominently in the cross contentions.
Oddly enough, the LIB OB corporate documents reflect the existence of both a “ Board of Governors ” and a “ Board of Directors ”, but there is a dispute as to which board is in fact the governing body of the organization. A stalemate has become compounded by the fact that the MLS opponents seemingly control the board of directors, while the MLS proponents appear to favor the authority of the board of governors.
The litigation takes a most complicated form. However, there are two issues basic to it, the resolution of which shapes the various specific grants of relief requested:
(1) Is the multiple listing service a legally permissible activity for a not-for-profit corporation such as LIB OB?
(2) Which board is the governing body of LIB OB, the one denominated “ Governors ” or the one denominated ‘ ‘ Directors ’ ’?
The court rules that the multiple listing service is not a permissible activity for LIB OB and that the governing body of the corporation is its board of governors.
I. The Board of Governors as the Governing Body
The corporation was originally formed under the Membership Corporations Law of New York in 1926. On September 1, 1970, while these actions were pending, the Not-For-Profit Corporations Law (N-PCL) took effect. That act is applicable to nonprofit corporations previously incorporated under the Membership Corporations Law (N-PCL, § 102, subd. [a], par. [5]; § 103, subd. [a]), and all actions and proceedings pending at its effective date are continued. (N-PCL, § 103, subd. [f].)
Under the law, every not-for-profit corporation must be managed by its board of directors unless otherwise provided in its certificate of incorporation. (N-PCL, § 701.) A similar provision has been included in the Membership Corporations Law since 1895. (See Membership Corporations Law of 1895, ch. 559, § 11.) The LIB OB certificate of incorporation simply *562 makes reference to the number of directors and contains no specification as to the board’s status or powers.
However, the statutory term “ director ” is defined as meaning ‘ ‘ any member of the governing board of a corporation, whether designated as director, trustee, manager, governor, or by any other title”. (N-PCL, § 102, suhd. [a], par. [6].) Even under the General Corporation Law governing this corporation prior to September 1, 1970, the term “ director ” was stated to include ‘ ‘ trustees or other persons, by whatever name known, duly chosen or designated to manage the affairs of a corporation”. (Of. General Corporation Law, § 3, subd. 13.) Moreover, article IX, section 1 of the corporation’s constitution and by-laws provides that “ The governing body * * * shall be a board of governors ”.
In light of these discrepancies in nomenclature, it becomes necessary to examine the history and usages of the corporation in order to determine the powers and intendments of the boards presently in existence.
A. Historical Eminence of the Board of Governors
In 1926, the Long Island Beal Estate Board, Inc. was incorporated and its certificate of incorporation designated and established a board of directors consisting of 21 members. In 1928, however, pursuant to section 20 of the Membership Corporations Law the corporation adopted a constitution and hy-laws which designated a board of governors as the governing body. The corporation nevertheless continued to operate under a board of directors through 1929. In 1930, a board of governors was first elected and no further directors were elected until 1964, a time when this dispute had begun to harden.
The corporation was actually managed by the board of governors in the period between 1930 and 1964. The term “ Board of Directors ” did not appear in the by-laws or constitution until January 1, 1963, and even then the by-laws clearly stated that: “ the governing body of the Board shall be a Board of Governors ’ ’ and that the ‘ ‘ Board of Directors shall have the power to manage and conduct the [corporate] affairs * * * between meetings of the Board of Governors * * * All actions of the Board of Directors shall be subject to review and approval by the Board of Governors ”. (Long Island Beal Estate Board, Inc., Constitution and By-Laws, art. XI, § 1; art. XII, § 2.)
In 1965, the corporation was consolidated with the Jamaica-Queens County Beal Estate Board, Inc. The 'Supreme Court order of consolidation approved a merger agreement providing *563 that the constitution and by-laws of the Long Island Real Estate Board, Inc. would continue as the constitution and by-laws of the consolidated corporation. In July, 1968, the name of the corporation was changed to its present form and another constitution and by-laws were adopted. Although the corporation then had a 11 Board of Directors ’ ’ in addition to the “Board of Governors”, the 1968 constitution and by-laws retained the identical provisions as to the controlling powers of the board of governors as the 1963 version quoted above.
These circumstances support the conclusion that the board of governors has been the governing body, the body in fact meant by the reference to “ Board of Directors” in the certificate of incorporation, and that the body nominally called “ Board of Directors ” is in actuality a committee subordinate to the board of governors.
Partially militating against this conclusion, perhaps, is the fact that the certificate of incorporation, as it emerged from the 1965 consolidation, provided that the board of directors shall consist of between 15 and 45 members. According to the 1970 LIBOR year book, the board of governors has 78 members and the board of directors has 21 members. However, while the 45 director member limitation did not appear in the certificate of incorporation until 1965, the previous certificate limitation was 21 members. In the years from 1926 through 1963, neither the “ Board of Governors ” nor “ Board of Directors ” complied with that size limitation, except in the years 1929 and 1935-1941. In sum, the limitation on the size of the governing body has been largely ignored throughout the corporate existence. Accordingly, the court finds that the board size cannot now become a controlling factor.
B. The Actuality of the Power of the Board of Governors
Notwithstanding a lack of artistry in the corporate papers and organization form, it is undeniable that the “ Board of Governors ” has, until the instant dispute, been a body superior in power to the “ Board of Directors ”.
More than that, the powers typical to the governing body are in fact delegated to the board of governors. Under the constitution and by-laws, the board of governors is the body which adopts the LIBOR budget, imposes spending limitations on the board of directors, holds a veto power over the hiring of an executive vice-president by the board of directors, appoints the nominating committee, approves committee appointments and MLC rules and elects officers. The merger with the *564 Jamaica-Queens County Beal Estate Board, Inc. was approved by the board of governors.
The present board of governors is made up of at least 22 people elected generally by the members of the corporation, as well as other members who serve as governors by virtue of being delegates or officers of local chapters, divisions and units or being present or former officers of the corporation. The board of governors is the only board which has representation elected directly by the members as such. The board of directors, on the other hand, is exclusively made up ex officio of various officers and chairmen of chapters, divisions and units, as well as various present and former corporate officers. Members of the board of directors must be governors, but elected governors need not be directors.
The rather peculiar state of affairs existing in LIBOR may be rationalized to ordinary corporate practice by observing that its board of governors is in real corporate counterpart the board of directors. Its nominal 1 ‘ Board of Directors” is in reality an executive committee. Its nominal executive committee, which is appointed by the board of directors, is in reality an administrative committee of management and is comprised of the LIBOR officers (elected by the board of governors) and the chairman of the board of directors (the method of whose selection is not set forth in the by-laws).
C. Subordination of MLG to the Board of Governors
Subsidiary to the determination that the board of governors is the organizational governing body is the recognition that other corporate committees must be subordinate to that governing board. Accordingly, the Multiple Listing Committee (MLC) which is a committee made up of a chairman, three vice-chairmen and 12 other members, all appointed by the LIBOR president, subject to confirmation by the board of governors, is subordinate to that governing board. MLC is not an entity separate from LIBOR; it derives its authority only through the corporate hierarchy. The actions of the MLC in operating the mulitple listing service activity, including the adoption of its regulations according to the corporate by-laws, are subject to the review and approval of the governors. The MLC may not operate autonomously from the over-all management of the corporation by the board of governors. (Constitution and By-Laws, art. XI, § 5; Ripley v. Storer, 1 Misc 2d 281, affd. 286 App. Div. 844, mod. on other grounds 309 N. Y. 506. mot. to vacate stay den. 309 N. Y. 976. See, N-PCL, § 701.)
*565 II. Impermissibility of Multiple Listing Service as a Business Activity A. MLS is a Business Activity for Subscribers
Prior to September of 1970, LIBOR was a nonprofit membership corporation under the New York Membership Corporations Law. Under the N-PCL, LIBOR will be required by September 1, 1973 (N-PCL, § 113) to make an election as to what type of corporation it will be under that new law. It will have the opportunity to elect to be, under section 201 of the N-PCL, either a Type “A ”, “ B ”, “ C ”, or “ D ”, corporation. Until LIBOR makes its election, it will be deemed under section 113 (subd. [a], par. [4]) of the N-PCL to be a Type “ B ” corporation. A Type “B” corporation is not-for-profit corporation pursuing nonbusiness activities for charitable, educational, religious, scientific, literary, or cultural purposes, or for the prevention of cruelty to children or animals. This is the kind of corporation normally embraced by section 501 (subd. [c], par. [3]) of the United States Internal Revenue Code (U. S. Code, tit. 26, § 501, subd. [c], par. [3]).
Accordingly, under the prior Membership Corporations Law (Columbia Univ. Club v. Higgins, 23 F. Supp. 572; Kubik v. American Composers Alliance, 54 N. Y. S. 2d 764), and under its current Type B status described in subdivision (b) of section 201 of the N-PCL, LIBOR cannot be engaged in business activities for the profit of all or part of its members. Section 204 of the N-PCL, provides that a corporation such as LIBOR, a not-for-profit corporation: “ shall conduct no activities for pecuniary profit or financial gain, whether or not in furtherance1 of its corporate purposes, except to the extent that such activity supports its other lawful activities then being conducted ’ ’. An object of that statute and one of the inquiries of this court is to determine whether activities are of a business or pecuniary nature and whether the objects of the corporation are being promoted, or whether the corporation is becoming a vehicle for abuse. (Matter of Hungarian Freedom Fighters Federation v. Samson, 30 Misc 2d 354.)
The general purposes of LIBOR, as set forth in its 1965 certificate of consolidation with the Jamaica-Queens Real Estate Board, Inc., are those of a trade association: to unite those engaged in the real estate business for the purpose of exerting beneficial influence upon matters affecting the real estate business and related interests, to provide a unified medium, to promote or maintain high standards of conduct *566 in the transaction of the real estate business as expressed in the code of ethics of the National Association of Beal Estate Boards, to advance the civic development iand economic growth of Long Island, to further real estate interests, to monitor the use of the legally protected term ‘1 realtor ’ ’ and generally to foster trade, prevent trade abuse, disseminate information, procure uniformity in customs and practices and to settle differences. There is a broad recital of purposes, but nowhere does it authorize the conduct of a business.
The large volume of MLS and its $300,000 fee contribution to LIBOB have been cited. At the present time the multiple listing activity occupies over three quarters of the LIBOB quarters and its activities consume the efforts of most of its employees. It receives between 30 to 75 residential real estate listings per day. The testimony was that any excess in receipts over expenses are plowed back into further development of MLS. There is no question in the case as to any diversion of funds.
Under its present authorization, LIBOB is a trade association intended to promote the general industry to which its members belong and to address itself to general problems incident to the industry as a whole and not to promote the actual business operations of all or any part of its members. (See N-PCL, § 1410.)
Operations such as those of the multiple listing service, conducted on the scale established, are business-type activities properly conducted by business corporations. In fact, the evidence is that there are at present some corporations supplying similar services, although much smaller than MLS. MLS is a business service paid for by subscribers as an optional matter over and above their required LIBOB dues. The major purpose of subscribing is to get business leads and to make money directly from the listings furnished.
The substantial MLS receipts of LIBOB are devoted to continued promotion and generation of real estate sales through the MLS and in expanding the scope and effectiveness of that service. The multiple listing service, without doubt, is a commercial activity to its core.
Any activity designed to increase the volume or profit of subscribing realtors through the offering of specific business opportunity, rather than to unite or upgrade realtors in general or to improve the profession or the community, would be an improper activity for a trade association. (See N-PCL, § 1410, subd. [a].) The fact that the income from those activities may *567 ultimately go to support the general goals of the corporation does not legitimatize the challenged activities. Income-producing activities: ‘£ cannot go beyond what is reasonably related to the requirements of the corporation’s operations ”. (Legis. Studies and Reports, N-PCL, § 204.)
In passing, we observe that the anti-MLS faction has made some point over the fact that MLS is creating unrelated business income which is subject to Federal income tax (U. S. Code, tit. 26, § 511 et seq.) and that its activity may, in fact, jeopardize the tax-exempt status of the organization. While this may be so, the court is not persuaded by this, for it is within the province of the officials and members of the organization to decide to continue their activities on such a basis that they may be taxed by the Federal Government in whole or in some part.
B. Election as to Corporate Type Will Not Change the Result
The parties have requested direction on all manners of action which should be maturely resolved by the officials and membership in orderly corporate proceedings. Courtroom struggles may result in a dramatic victory by battle for one side or another, but the maintenance of corporate peace and health is more intimately involved with the conference table, the meeting room and the understanding mind and willing disposition. In point is the request of the anti-MLS faction that this court now direct LIBOR to file a certificate as a Type ££ A ” corporation under subdivision (a) of section 113 of the N-PCL.
According to that statute, every not-for-profit corporation, by September 1, 1973, must file with the Secretary of State a certificate designating the statutory classification to which the corporation wishes to belong. As previously indicated, the various possible categories under section 201 of the N-PCL, are Types “A”, “ B ”, “ C ” or “ D ”. Trade associations which operate strictly as such are Type ££'A” corporations. (N-PCL, §§ 201, 1410, subd. [b].) However, it is possible for LIBOR to qualify as a different type of corporation, even though that might conceivably involve changing corporate purposes or the certificate of incorporation. Since it is possible for the corporation to qualify for another classification, depending upon the wishes of its membership, the court will not impose its judgment on LIBOR (Grace v. Grace Inst., 22 A D 2d 897.) This election of type need not be made until September 1, 1973, which is a significant time away. There is no genuine reason to preclude the corporation or its membership from any options *568 which may accrue to it by waiting, if that is the course of conduct democratically chosen.
Regardless of the type category the corporation ultimately elects, however, the court believes that the multiple listing service will not be a permissible activity. Under Types ‘ ‘ A ” and “B ”, the corporation would have to be for nonbusiness purposes. Since the essential nature of MLS is that of business, its continuance as either of these two types cannot be permissible.
If the corporation were somehow to arrange itself into Type “ C ” eligibility, MLS would still be improper. This, is because Type “ C ” not-for-profit corporations may be formed for any lawful business purpose, but only “ to achieve a lawful public or quasi-public objective ”. Under Type “ C ”, the corporate purposes must be nonpecuniary, and there must be no flow through to the individual participants. In other words, the corporation may be organized to conduct an activity normally performed by regular business corporations for profit, but the purpose of a Type “ C ” not-for-profit corporation must be an objective other than the making of money. (See Legis. Studies and Reports, N-PCL, § 201.) •
MLS is now primarily for the making of money by its subscribers. It is conceivable that the multiple listing activity could be revamped to an entirely . different basis. If this, becomes so, of course, its particular facts would have to be examined. However, for the guidance of the parties, it must be specified that so long as MLS is a money-maker for subscribing participants, it must be an offensive activity for a not-for-profit corporation, particularly where the activity constitutes a substantial part of the corporation’s affairs.
The court does not address itself to a pure Type “D” election because of its improbability in LIBOR’s, circumstance.
C. A Regular Business Corporation for MLS is Not Precluded
A point raised in pretrial conferences merits treatment here, and that is the possibility that a multiple listing service be carried on not by LIBOR, but through a regular business corporation, all of the stock of which would be held by LIBOR. See section 202 (subd. [a], par. [6]) of the N-PCL adopting verbatim the language of section 202 (subd, [a], .par. [6]) of the Business Corporation Law. This is, in fact, an alternate procedure recommended by the National Association of Real Estate Boards of which LIBOR is a constituent organization. If the officials and members of LIBOR wish to transfer the *569 MLS activity to a subsidiary corporation, there is no preventative in this opinion, providing, of course, that all pertinent laws are observed in the formative procedure.
The court is, moreover, mindful that an action has been brought by the United States Government against LIB OB for price fixing of commissions and unlawful restraint of trade and that this relates at least in part to MLS. This opinion does not deal with such questions, which were not presented and which are beyond its jurisdiction. However, regardless of the outcome of the Federal case, the principles of this decision remain unaffected. If MLS as a result of that litigation is entirely discontinued, then, of course, the problem of eliminating the MLS activity is moot. On the other hand, if MLS is not ultimately affected by the Federal Government’s action, or is modified in such a way as to retain the essential commercial or business characteristics of its operation, the principles of this decision would require its discontinuance by LIB OB as a not-for-profit corporation.
D. Conclusion
The court will direct LIB OB to discontinue operating multiple listing service and in order to provide for an orderly transition to other arrangements will prescribe more particularly in the interlocutory judgment to be entered with the decision the terms and conditions of the discontinuance. It would be needless duplication to repeat in this memorandum these and the other procedural conditions there prescribed.
III. A Membership Meeting will be Convened wider Judicial Supervision
Ancillary to the principal points of the case are a whole host of determinations largely procedural. These involve the effects of the May 25, 1970 membership meeting, the requests of the pro-MLS faction for the convening of a special meeting of the board of governors and of the members, the terms and regulation of the meetings, requested proposals to amend by-laws, and more. The authority of the court to intervene in corporate proceedings in matters of compliance with the corporation’s charter and by-laws is well-settled where, as here, the need for such intervention is clearly demonstrated (N-PCL, § 114; Matter of Steel v. Knowles, 267 App. Div. 784, mot. for rearg. den. 267 App. Div. 910; Mason v. Basic Props., 230 N. Y. S. 2d 560, affd. 17 A D 2d 769; Reiter v. American Legion, 189 Misc. 1053, affd. 273 App. Div. 757, mot. for lv. to app. den. 273 App. Div. 877.)
*570 Since February 19, 1970 there has been active disputation about meetings and much rumbling. On April 30, 1970, Mr. Justice Meyer of this court, on the application of the pro-MLS faction, ordered a membership meeting (see Chappell v. The Officers et al. Sup. Ct, Nassau County, Index No. 4290/70). On May 11, 1970 the anti-MLS faction instituted Action No. 1 in this case and sought an injunction pendente lite restraining the scheduled May 25, 1970 membership meeting. The motion was denied by Mr. Justice D’Auria (see Santos v. Chappell, Sup. Ct, Nassau County, Index No. 4818/70), A membership meeting was then held on May 25, 1970 with the LIBOR president presiding. However, the procedure followed at the meeting distorted Mr. Justice Meyer’s directions. (See Salzman v. Sakofsky, 195 Misc. 166; White v. White, 175 Misc. 66.) It was indicated in his memorandum decision that the agenda, as set forth in the' meeting notice, need contain only the purpose and object of the proposed amendments to the by-laws and need not set forth the specific wording of the amendments. Instead of seeking the formulation of cogent amendments, the presiding officer simply put the sketchy outline language of the agenda to the vote. The amendments voted upon are not sufficiently clear for implementation and fall below the informative standards expected in corporate by-laws. Moreover, this court finds that the May 25, 1970 meeting was rampant with confusion and improperly informed as to the matters voted upon. For these reasons and the interests of justice, the results of that meeting must be- set aside and a new meeting scheduled to consider those proposals which are still appropriate in light of this opinion. (Matter of Steel v. Knowles, supra.)
On June 27, 1970 a third written request for a membership meeting was submitted, signed by 36 active LIBOR members and calling for a membership meeting to be held on July 25, 1970. When this request was disregarded, the pro-MLS faction commenced Action No. 2 in this case. The court finds, for the .reasons set forth in Mr. Justice Meyer’s decision in Chappell v. The Officers {supra) that this notice was proper and that the LIBOR officers wrongfully refused to call the requested meeting.
Accordingly, the court will direct that another membership meeting be held. To minimize the combative conduct of the last meeting, to maintain decorum, to insure compliance with the court’s directions, and to have a report on the proceedings, the court, in its interlocutory judgment accompanying this memorandum, will appoint, pursuant to its authority under *571 CPLR 4311, a Referee to conduct that meeting and the meeting of the board of governors immediately following it. This court may grant any type of relief within its jurisdiction, whether or not demanded, imposing such terms as may be just. (CPLR 3017, subd. [a]. See, also, Weil v. Atlantic Beach Holding Corp., 1 N Y 2d 20, 29.) The Referee’s fee will be fixed .in the final judgment addressed to the results of the meeting.
The court is aware that during the pendency of these actions, and while the preliminary order of this court staying certain activities by the parties has been in effect, further events have inevitably transpired. With the close of 1970, the terms of the LIBOR officers have expired. (By-Laws, art. X, §§ 2, 5; art. XI, § 3.) No nominating committee has been selected by the board of governors in accordance with section 5 of article X of the by-laws. Similarly, the terms of many members of the board of governors have expired (By-Laws, art. XI, § 4) and a nominating committee for the election of new governors has not been formed. (By-Laws, art. XII, § 5.) Furthermore, the extant board of governors should not be permitted to proceed with elections for new LIBOR officers because it exceeds the size specified in the certificate of incorporation.
To expedite establishment of the 1971 LIBOR management, and to get the corporation on a stable track, the court will, in the accompanying interlocutory judgment, direct the sending of notices to all members of an annual membership meeting to be held on a specified date. The contents of the notice of meeting, including its agenda and by-law proposals, the nominating procedures, and the conduct of the meeting shall be as set forth in that judgment. Upon completion of the meeting, the Referee will render a report to this court as to the outcome of the meeting and this court will then issue such further and final order as may be just and indicated under the circumstances. The membership meetings directed in that interlocutory judgment will not include consideration of the dismissal of Herbert Katz as executive director of MLS, since his dismissal by the officers of LIBOR, without authority of the board of governors or board of directors, was beyond the powers of those officers acting alone. Mr. Katz’ role should be determined by the board of governors, as constituted following the membership meeting directed in this decision, both in view of the scope of this decision with respect to MLS and to governing body authority. In the interim, the status of Mr. Katz shall remain as directed by the court in its order dated December 17, 1970.