AARON COLISH v. BRANDYWINE RACEWAY ASSOCIATION, INC., a Delaware Corporation.

(*August* 25, 1955.)

CAREY, J., sitting.

*Stewart Lynch* and *Florence E. Freeman* for plaintiff.

*S. Samuel Arsht* and *John T. Gallagher* (of the firm of Morris, Steel, Nichols and Arsht) for defendant.

Superior Court for New Castle County, No. 265, Civil Action, 1953.

CAREY, J.:

A rather lengthy statement of the facts, as a jury could find them, is necessary to understand the issues of this case. The defendant corporation was organized on October 21, 1952 for the purpose of erecting and operating a race track. Its first Board of Directors consisted of four individuals who were also its officers. They were Benjamin F. Shaw II, President; Nathan Miller, Vice-President; John C. Hazzard, Secretary; and John W. Kane, Treasurer. Shaw submitted his resignation as President and Director on November 20, 1952, and it was accepted by the Board on the following December 12th. Nobody was elected to succeed him until February 18, 1953, at which time George T. Weymouth was elected President and Director. Kane resigned as Treasurer and Director on February 13, 1953.

The plaintiff is a registered architect, who claims that he was employed by the corporation to prepare plans for the construction of a grand stand, stables, and other buildings for the race track at a fee of five per cent of the cost of construction. The complaint alleges that defendant repudiated his contract on January 10, 1953. Plaintiff claims the sum of $62,500 under the contract.

The plaintiff was originally brought into this picture by Allan Hart, who at various times has been associated with the plaintiff in a number of other building projects. Mr. Hart was never elected a director or officer of Brandywine. His precise relationship to that corporation is the subject of another pending suit in this Court. The affidavits of Shaw and Hazzard state that they had never heard of Hart until early in January 1953, when they received a letter from his attorney demanding "recognition of his efforts" and the establishment of a basis for compensating him for his work.

In any event, Hart and Kane had been interested in starting a race track since 1950, had looked at a number of possible sites, and had organized a corporation called Wilmington Race-

way Association with the view of obtaining necessary permits, as well as finances, for the construction and operation of a track. They had Colish prepare some preliminary plot plans for two or three sites, including the one eventually purchased by Brandywine. In order to prepare those plot plans, Colish visited the sites and, of course, held several conferences with Hart and Kane.

The reasons why Wilmington Raceway Association's project never materialized are unimportant. Colish apparently learned on October 28, 1952 for the first time that Brandywine was the corporation for which Kane was then making efforts to obtain permits and financing. On that day Colish, by request, came to the site later purchased by Brandywine. He there met Kane and Hart who were accompanied by Miller. After looking over the grounds the four had luncheon together, during the course of which the project was discussed at great length. Colish then made it plain to Miller that he had been working with Kane and Hart, and that he hoped to secure the job of being the final architect on the project, for which his fee would be five per cent of the construction cost.

Early in November the Delaware Harness Racing Commission granted a racing permit to Brandywine. It was necessary, however, to obtain a building permit from the Building Commission and for this purpose preliminary plans were needed. Rumors indicated a possible rezoning of the area which included the proposed site, and if this rezoning took place it might prevent the granting of a building permit. In view of this, preliminary plans were needed quickly, and Kane accordingly asked Hart to call the plaintiff right away. Hart did so, after obtaining Miller's approval. The precise instructions given Hart by Kane are in dispute. The latter says that he told Hart simply to have Colish draw the necessary preliminary plans for presentation to the Building Commission. Hart says that he was told to employ Colish for the whole job. In any event, Hart called Colish and told him that he was employed as architect for the

project and explained the urgency for the preparation of preliminary plans. Colish stated that these could not be drawn until he was provided with a surveyor's drawing. Hart then called Kane and got his permission to employ surveyors. He later delivered the survey to Colish who, by working night and day, was able to send the preliminary plans consisting of 3 drawings to Kane on November 21st. Hart presented them to the Building Commission, which granted a building permit on November 24th.

After this date, Colish continued to do some work on the project. The complaint charges that defendant repudiated its contract on January 10, but the plaintiff testified in his deposition that he still considered himself employed on January 28, 1953. Whatever interval of time there was, his work during this period consisted principally in talking with various prospective contractors, obtaining prices on certain materials, and particularly trying to find someone who could supply the necessary steel very quickly. It was during this interval that he learned of the so-called Dodge Report respecting his employment and talked with one Levine on the same subject, both of which matters are discussed further hereinafter.

It was on January 28 that Colish had luncheon with Miller and Mr. Arsht, defendant's counsel. At that time, Miller informed him that Kane was getting out of the corporation and that he (Miller) was the "boss". Miller expressed grave doubts as to the possibility of proceeding with the project because of lack of finances. Colish stated that he had some friends in Philadelphia who might be interested in providing the money but Miller thought that he should first exhaust the possibility of interesting Delawareans. As to the plaintiff's employment, the conversation which took place that day is in dispute. Colish says that he told the others he expected to "continue" to be the architect if the project was carried through, and that he explained to them the extent of the work he had already done on it. There was some discussion as to his fee and he again stated that it

would be five per cent. Miller's affidavit, on the other hand, indicates that plaintiff merely asked to be considered for the job when the time came to employ an architect. Miller further indicates that he told plaintiff that he had no authority to employ an architect; that it was premature to do so until financing was arranged; and that only the Board of Directors could authorize the employment of an architect. Miller further says that Arsht asked plaintiff if he was making any charge against defendant for what had been done up to that time, whereupon plaintiff replied that he had no claim for what had happened in the past and that the only thing he asked of defendant was that he be considered by defendant for employment, if the project proceeded. The following day Colish wrote to Miller enclosing a copy of the three preliminary drawings which had been presented to the Building Commission and stated "I will wait to hear from you in regard to backers if you do not work out your problem successfully." Miller further says that defendant did give consideration to employing Colish after backers were obtained but it was impossible to employ him because the backers insisted upon completion of the track in time to conduct races in September, and the only way this could be done was by locating an architect who had previously handled a similar project and could supply detailed plans immediately. Plaintiff could not do this as he had never before designed a race track.

The only resolution appearing on the corporation's minutes concerning the employment of an architect is one dated December 12, 1952. At a meeting on that date, purportedly attended by Hazzard, Kane and Miller, it was unanimously resolved that Miller and Kane, acting jointly, be authorized to engage one or more architects to prepare plans and specifications for the proposed track. Nothing was said at that meeting to indicate that plaintiff had already been selected or engaged for the work. Nothing in the corporate charter or by-laws purports to expressly authorize any officer to engage an architect.

Plaintiff's suit is based upon an alleged *express* contract; the complaint contains no count predicated upon *quantum*

*meruit.* Defendant denies the existence of any express contract, and then asserts that, even if one or more individuals made such a contract with plaintiff, such individual or individuals had no authority, express, implied, or apparent, to make it. Defendant further contends that there was an accord and satisfaction concluded between plaintiff and defendant at the luncheon meeting of January 28. Plaintiff points out no specific occasion upon which his offer was expressly accepted in so many words by anyone, except the telephone call from Hart directing him to proceed with plans and specifications. He contends that Miller, Kane and Hart, and each of them, had apparent authority to bind the corporation, and that defendant in fact accepted what plaintiff had been asked to produce and did produce, thereby ratifying the agreement. Plaintiff, of course, denies that any accord and satisfaction was made on January 28 and further argues that, even if it be held that one was reached, it was without consideration and therefore not binding. He suggests, in short, that there exist factual disputes both as to authority of defendant's agents and as to the making of an accord and satisfaction, which disputes prevent the entry of summary judgment in defendant's favor.

It was said in *Woodcock v. Udell,* 9 *Terry* 69, 97 *A.* 2d 878, 883:

"Rule 56(e) provides that affidavits shall be made on personal knowledge, must set forth such facts as would be admissible in evidence, and must show affirmatively that the affiant is competent to testify to the matters stated therein. An affidavit which fails to meet this test cannot be relied upon to show the existence of a disputed fact. 3 *Barron & Holtzoff* 93 etc.; *Seward v. Nissen, D. C.,* 2 *F. R. D.* 545. On a motion for summary judgment, the party opposing that motion is duty bound to disclose evidence which will demonstrate the existence of a genuine issue of fact for submission to the jury, if summary judgment is to be denied. *Frank C. Sparks Co. v. Huber Baking Co.,* [9 *Terry* 9], 96 *A.* 2d 456."

[3] Two items of evidence discussed in plaintiff's brief are not within the requirements of this rule and must be ignored in the decision of the present motion. One such item is the so-called Dodge Report. This is a trade publication issued for the benefit of contractors and material men, giving data about various contemplated building projects in order to help subscribers secure business. One such report, issued prior to December 15, 1952, contained the statement that plaintiff had been retained as architect for the Brandywine Raceway. Nothing in the record shows where the publisher obtained this information, or indicates that any officer, director or employee of defendant authorized publication of the statement or even knew of it before the taking of plaintiff's deposition on November 4, 1953. In this state of the record, the report is obviously not admissible evidence.

Another such item is the plaintiff's testimony concerning a telephone conversation with Samuel Levine. He was employed in the Philadelphia office of Warner Company, whereas Hazzard was at the time connected with the Wilmington office of the same corporation. Plaintiff testified that Levine called him and stated that Hazzard had informed him (Levine) that Colish had the job as architect for the Raceway. This call was apparently some time in December 1952. Obviously this hearsay testimony of the plaintiff would be inadmissible at the trial and does not comply with the requirements of the quoted rule.

I do not understand plaintiff to rely upon any authority expressly granted to Miller, Kane or Hart. Certainly nothing in the record before me shows any express authorization prior to the resolution of December 12 empowering Miller and Kane, acting jointly, to engage an architect. It is not suggested that plaintiff's employment was predicated on this resolution; in fact, it is plaintiff's contention that he was hired before the resolution was ever passed.

In the light of all the circumstances, authority cannot be found in the implied powers of Kane, as Treasurer and Direc-

tor, or of Miller, as Vice President and Director, either before or after Shaw's resignation. In this instance, the employment of a final architect was not an act of an ordinary nature which by usage or necessity was incidental to the office of either of them. See *Atlantic Refining Co. v. Ingalls & Co.*, 7 *W. W. Harr.* 503, 185 *A.* 885. The rule mentioned in *Italo-Petroleum Corp. v. Hannigan*, 1 *Terry* 534, 14 *A.* 2d 401, to the effect that the president of a private corporation is presumed to have, by virtue of his office, certain more or less limited powers in the transaction of the usual and ordinary business of the corporation, is not applicable here because this particular transaction was not in the ordinary course of defendant's business. The main, and probably only, purpose of its creation was to erect and operate a race track. In the erection thereof, it spent well over one million dollars, according to the complaint. The demanded fee is $62,500. The services of an architect were not required merely for slight alterations or additions to an existing plant; they were needed for the purpose of designing and laying out an entirely new plant for the operation of defendant's whole enterprise. The possibility of rezoning may be a reason for implying, out of necessity, the power to hire an architect to make preliminary plans for presentation to the Building Commission, but it does not furnish sufficient reason for implying the power to engage the final architect.

Plaintiff suggests that Miller ostensibly acted as general manager of the defendant, had taken general control of defendant's affairs from the outset, and seemingly exercised broad powers. He, therefore, argues that his employment was at least within the apparent authority of Miller. It would seem that the specific acts set out in the record hardly justified plaintiff in considering Miller to be the general manager. For the reasons given above, even if he had been actually in possession of that office, he still would have had no implied authority to enter this unusual and extraordinary contract.

In fact, plaintiff's principal reliance is upon the doctrine of apparent authority, which has been recognized by our

Courts. *Greenspon's Sons Iron & Steel Co. v. Pecos Valley Gas Co.*, 4 *W. W. Harr.* 567, 156 *A.* 350; *Italo-Petroleum Corp. v. Hannigan, supra.* Such authority may result from (1) the general manner by which the corporation holds out an officer or agent as having power to act, or (2) the acquiescence in his acts of a particular nature, with actual or constructive knowledge thereof, 2 *Fletcher on Corporations* (Perm. Ed.) 363. Of course, this case does not fall within the second of these categories; neither officer had before made any such contract as this. Likewise, under the circumstances here presented, the fact that Miller or Kane had previously been allowed to exercise wide powers in other matters, either with or without express authority, was insufficient to justify reliance upon ostensible authority in a transaction of this unusual nature. This case, therefore, does not come within the first category. Moreover, the acts of Miller and Kane themselves cannot be relied upon to establish their authority. 2 *Fletcher on Corporations* (Perm. Ed.) 388; 1 *Mechum on Agency* (2d Ed.) 532. This is not a case where those two men in fact constituted the corporation; they were only one-half the directors and officers. We cannot, therefore, disregard the corporate entity and treat the corporation as the alter ego of the two individuals. Nor is the corporation estopped by any representations of Kane as to Miller's authority, since there is nothing to show that the former had any power to bind the corporation in any such way. *Cf.* 2 *Fletcher on Corporations* (Perm. Ed.) 369. If Colish was misled as to the extent of the officers' authority, the deception was caused by the individuals themselves, not by the corporation.

■ Finally, it is clear that there was no ratification of a contract to hire Colish as the final architect, because the record contains no competent evidence to show that Shaw and Hazzard knew that such a contract was made. See *Hirzel Funeral Homes v. Equitable Trust Co.*, 7 *Terry* 334, 83 *A.* 2d 700. It is true that the corporation received the benefit of Colish's preliminary plans in that they were used to secure the building permit, but knowledge that Miller or Kane had employed someone to pre-

pare preliminary plans does not imply knowledge of the broad contract, if one was made. Acceptance and use of these preliminary plans might create a right of action in *quantum meruit*, but this is a suit only on the alleged express contract.

Plaintiff's brief contains the suggestion that there are other pertinent facts which have not been brought into the record and which might well justify the refusal of summary judgment. We are left to speculate as to what they may be. In order to avoid the entry of summary judgment against him, the duty was upon the plaintiff to disclose evidence demonstrating the existence of a genuine issue of fact for submission to the jury. *Frank C. Sparks Co. v. Huber Baking Co.,* 9 *Terry* 9, 96 *A.* 2d 456. While he has demonstrated a conflict of fact as to some questions, those disputes are immaterial at the present time because, even if plaintiff's version as to them is true, submission of the case to a jury would still be improper by reason of the lack of evidence to support the claim of agency. It is, of course, unnecessary to discuss the defense of accord and satisfaction in view of the conclusion herein announced.

As indicated earlier, this case has been briefed, argued, and decided strictly upon the issue of an express contract only. As to the case thus presented, I am of the opinion that defendant's motion must be granted.