Aldine F. ROCHESTER, Administratrix of the Estate of Spencer L. Rochester, Deceased, Plaintiff Below, Appellant,

v.

Maurice M. KATALAN, M.D., et al., Defendants Below, Appellees.

Supreme Court of Delaware.

April 26, 1974.

Leonard L. Williams, Wilmington, for appellant.

F. Alton Tybout, of Tybout, Redfearn & Schnee, Wilmington, for appellee Maurice M. Katalan, M.D.

Rodney M. Layton and Wendell Fenton, of Richards, Layton & Finger, Wilmington, for appellee Doctors for Emergency Service, Ronald C. Corbalis, M.D.

William J. Alsentzer, Jr., of Bayard, Brill & Handelman, Wilmington, for appellee Wilmington Medical Center, Inc.

Before CAREY and DUFFY, JJ., and BROWN, Vice Chancellor.

DUFFY, Justice.

In this medical malpractice action for wrongful death the Superior Court granted summary judgment for defendants and plaintiff appeals.

I

First, plaintiff contends that the Court below erred in considering a report, submitted by a defendant, of an investigation into decedent's death prepared by the Attorney General's Office and addressed to "Members of the New Castle County Grand Jury", because it was hearsay.

Assuming *arguendo* that consideration of the document was legally impermissible in light of Superior Court Civil Rule 56, Del.C.Ann., plaintiff has failed to establish prejudice therefrom.[1] Indeed, many of the facts in the report were developed independently for the record by deposition, compare Barks v. Herzberg, Del. Supr., 206 A.2d 507 (1965), and it does not appear to us that the Trial Court relied on the report in any significant way.[2]

In any event, objection here comes too late. The general rule is that evidentiary questions may not be raised for the first time on appeal. Cf. Stevenson v. Henning, Del.Supr., 268 A.2d 872 (1970); Kent v. Parker, Del.Supr., 8 Terry 151, 89 A.2d 133 (1952). Specifically, in the absence of a motion to strike or other objection, it is not improper for a trial court to consider a document, although technically it fails to conform to the requirements of Rule 56. United States v. Western Electric Co., 9 Cir., 337 F.2d 568 (1964); 6 Moore, Federal Practice, ¶ 56.22[1]. And the comments in Colish v. Brandywine Raceway Association, Del.Super., 10 Terry 493, 119 A.2d 887 (1955), and Woodcock v. Udell, Del.Super., 9 Terry 69, 97 A.2d 878 (1953), do not lead to a different conclusion; each is a trial court opinion so it is manifest that Rule 56 defects in the documents submitted were brought to that Court's attention. That was not done here and, therefore, we will not disturb the

---

1. Rule 56 provides in pertinent part:

   "(c) . . . The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. . . .

   . . . . . . .

   (e) . . . Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or affidavits."

2. Plaintiff claims that certain language in the opinion of the Court below indicates "bias" derived from the report but, simply stated, we are unable to agree with that conclusion.

judgment in an appellate review where plain error is not involved.[3]

## II

Second, plaintiff asserts that the Superior Court erred in ruling as a matter of law that the action was barred by decedent's negligence.

### A.

The material facts are not disputed. At approximately 6:30 P.M. on March 12, 1971 decedent, Spencer L. Rochester, and a companion were taken for treatment to the emergency room, Delaware Division of the Wilmington Medical Center, by two police officers who had them in custody. Rochester had a nose injury. More significantly, he and his friend claimed to be heroin addicts suffering withdrawal symptoms. Rochester stated to hospital authorities that he was a "junkie" and had a habit requiring four or five bags of heroin daily. Both men requested some form of medication for their discomfort.[4] The physician on duty in the emergency room, Dr. Maurice M. Katalan, asked decedent whether he had attended the methadone clinic. Rochester responded that he had participated in the program for four months but had dropped out because he had found a new supply source for his heroin.

The active solicitation by both men for medication was supplemented by manifestation of physical symptoms consistent with their claimed withdrawal. They were loud, abusive and uncooperative. Rolling his head and clutching his stomach, Rochester complained of abdominal pains; his eyes appeared glassy; he moaned; his body was shaking; he seemed agitated. After hearing their stories and noting their actions, Dr. Katalan ordered a 40 mg. dosage of methadone for each man. Although his companion calmed down thereafter, Rochester persisted in his behavior. He became violent and beat his head against a wall, and he told Dr. Katalan that he was still sick and needed more methadone. Consequently, approximately thirty to forty-five minutes after the initial dose, Dr. Katalan instructed a nurse that a second 40 mg. of methadone be given decedent and that he be observed for thirty minutes thereafter.[5] Shortly after receiving the second dosage decedent quieted down and was taken to a cell by the police officers. The following morning the turnkey was unable to awaken him. An ambulance was summoned and decedent was pronounced dead on arrival at the Delaware Division.

This tragedy took on a most unusual posture when it was later determined that Rochester had never been an addict nor had he participated in a methadone program. His companion was, in fact, a heroin addict. The record also indicates that late in the afternoon of March 12, shortly before being taken into custody by police, Rochester had consumed a quantity of beer

---

3. In considering and deciding the appeal we have not relied in any way upon the report.

4. The record establishes that decedent requested "something" and there is evidence that he specifically asked for methadone.

5. Plaintiff argues that when the doctor ordered the second 40 mg. of methadone, the nurse to whom the order was given expressed concern at the quantity. The record, however, does not support this contention. The nurse testified at deposition:

"Q. . . . Did you say anything to the doctor while he was saying this [ordering another 40 mg. dose of methadone] to you? A. I think he said that he was to have 80 milligrams of methadone, and I had asked Dr. Katalan if he meant for Mr. Rochester to have the total of 80 milligrams or to have 80 milligrams now because he already had 40 and it would be too much for him. He said he was just to have 40 now. That would be a total of 80 milligrams.

It is clear that the nurse was simply attempting to clarify the order given by the doctor. Any implication of concern read into her testimony stems not from the additional 40 mg. dose actually prescribed, but from the possibility of an 80 mg. dose which would have brought the total amount ordered to 120 mg. In short, here testimony suggests that an additional 80 mg. would have been "too much". The suggestion does not apply to the 40 mg. actually given.

or malt liquor and a number of librium pills. He did not give any such information to hospital authorities. These facts are significant because the autopsy showed that Rochester died from multiple drug intoxication.

### B.

■ We emphasize that the case, in its present posture, calls for the Court to begin with the premise that all defendants were negligent in a way that proximately caused Rochester's death. The critical issue before us now is not defendants' conduct; it is whether Rochester contributed to his own death because, if he did, there can be no recovery even if defendants were negligent as we have assumed.[6]

Plaintiff principally relies upon two cases to support her argument that the claim is not barred by decedent's conduct. We have considered both of those cases in reviewing the judgment below and in studying plaintiff's right to a reversal. But we conclude that neither case is persuasive, both are distinguishable.

The first case, Los Alamos Medical Center v. Coe, 58 N.M. 686, 275 P.2d 175 (1954), involved a claim against a physician for permitting a patient to become addicted to morphine, which was freely administered pursuant to the doctor's orders. In ruling on the physician's assertion that the patient was contributorily negligent and had assumed the risk, the Court approved the following statement of law from 41 Am.Jur., Physicians and Surgeons, § 80:

"Negligence of the patient, to constitute a bar to the suit, must have been an active and efficient contributing cause of the injury; it must have been simultaneous and co-operating with the fault of the defendant, must have entered into

the creation of the cause of action, and have been an element in the transaction which constituted it. Where the fault of the patient was subsequent to the fault of the physician and merely aggravated the injury inflicted by the physician, it only affects the amount of the damages recoverable by the patient. Since the patient may rely on the directions of his physician, it follows that he incurs no liability by doing so. . . ."

(See 61 Am.Jur.2d, § 108.)

Although there was evidence that the patient falsely complained of pain in order to get a prescription, there was also evidence that the plaintiffs (patient and her husband) had expressed concern over possible harmful effects of the drug. The doctor advised them not to worry and that the patient could have morphine whenever she felt a need. From this the Court reasoned that the doctor was aware of possible consequences of continued administration of morphine and yet continued to assure plaintiff that harm would not follow from use. It is obvious from the Court's reliance on these facts that it applied the test relating to fault of a patient *subsequent* to that of the physician; that is, the Court applied the latter portion of the above rule and held that the patient's actions did not bar recovery. Any fault by the patient occurred after a long period of treatment by the doctor in which morphine had been freely given. The case is not comparable in its critical facts.

A like result was reached on similar facts in King v. Soloman, 323 Mass. 326, 81 N.E.2d 838 (1948). There, the patient did not actively seek morphine injections until after treatment had been ongoing for some time. Again, as in *Los Alamos*, the patient's conduct occurred subsequent to initiation of morphine treatments by the physician.

---

6. Defendants deny that they were negligent in any way and they variously assert contributory negligence and assumption of risk. Since the legal significance of both affirma-

tive defenses is essentially the same and because the Trial Court's ruling was founded on contributory negligence, we discuss only that defense in this opinion.

In this case the Superior Court found decedent's behavior an "efficient, active, contributing (and . . . proximate) cause of his death", thus utilizing the first part of the rule outlined in Am.Jur. and quoted with approval in *Los Alamos*. We agree.

The undisputed facts show that Rochester put on an act, tragic in its consequences but effective in the emergency room under the circumstances in which it was performed. For reasons of his own, he demonstrated the clinical symptoms associated with heroin withdrawal and confirmed them by insisting that he was an addict. It is no answer to this to say, as plaintiff argues, that the doctor and staff could have done more to determine the truth of Rochester's assertions. We have already assumed negligence in that respect. The critical issue involves Rochester's conduct, not that of defendants. Whatever Rochester's purpose, his conduct was a true tragedy for all who were involved. And he continued the contribution to his own destruction by failing to tell the medical people present the facts (he was not an addict, he had been drinking and taking librium) and by asking for more.

■ In the emergency room Dr. Katalan ordered the methadone but there has been no showing that the quantity administered was in an amount which would harm an addict with a habit of the dimensions decedent claimed.[7] And although Dr. Katalan admitted in his deposition that 80 mg. of methadone could be fatal to a person not using heroin, in light of the factual context in which he prescribed the medication, that is of little moment.

Our analysis of the record persuades us that, beyond doubt, Rochester causally contributed to his death up to the time when it occurred. Had he informed defendants or hospital personnel that he neither was currently nor had ever been a heroin addict (even after the original deliberately misleading statements and actions), proper measures might have been taken to avoid potential ill effects from administration of the methadone. It is the failure to exercise the power to correct the situation which rendered decedent's actions continuing negligence on his part. What is significant is that aside from being at least partially responsible for causing use of the methadone, decedent possessed the power to thereafter set in motion procedures which might have prevented the result.

### III

Invoking the last clear chance doctrine, McGraw v. Corrin, Del.Supr., 303 A.2d 641 (1973); Lord v. Poore, Del.Supr., 9 Terry 595, 108 A.2d 366 (1954); Island Express v. Frederick, Del.Supr., 5 W.W.Harr. 569, 171 A. 181 (1934), plaintiff argues also that any negligence on decedent's part was a remote and not a proximate cause of his death. The facts in this record, however, show neither successive acts of negligence nor that the doctor had the last chance to avoid the ultimate consequences of all that occurred. Rather, it was the decedent who put on an effective act which induced the doctor to do what the decedent wanted (to administer "something" intended to provide relief from heroin withdrawal pangs); he took the medication offered and continued to act out a deception to obtain another dose. Again he was successful and again he willingly took the medication. The deception was complete when he left with the police, still without telling any of the emergency room personnel the truth. That conduct admits of only one conclusion:

---

7. Plaintiff's "Further Answers to Interrogatories Directed to Plaintiff" indicates how one of her expert witnesses, a physician, would testify as to the malpractice of Dr. Katalan. However, the record does not include either the deposition or affidavit of that expert. Without such documentation the answers cannot be considered on face value alone. To do so calls for speculation and conjecture as to what the doctor would say. It is fundamental that a motion for summary judgment must be decided on the record presented and not on evidence potentially possible. United States v. Article Consisting of 36 Boxes, D.Del., 284 F.Supp. 107 (1968), aff'd 415 F.2d 369 (3 Cir., 1969).

Rochester's conduct contributed directly to his own death.

Finally, we should say that while we have discussed the decedent's conduct in traditional negligence terms it is more accurately described as "wilful" or "intentional". It was, in short, deliberate rather than careless. Measured by the more moderate standard applied here and in the Trial Court, the decision must be for defendants, as we have indicated, and fairness of that result is underscored when tested by the common-sense duty of a patient to be truthful in describing his symptoms to a physician to whom he looks for assistance. It is the duty of a patient to use such care as a man of ordinary prudence would ordinarily use in circumstances like his own, and if he fails to do this he cannot hold the physician accountable for the consequences of his own want of ordinary care. 61 Am.Jur.2d, supra, § 108. Wilful or intentional deception of the physician certainly violates that rule.

\*    \*    \*    \*    \*    \*

Affirmed.