[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON PREJUDGMENT REMEDY APPLICATION
The plaintiff has sued the defendant company based on several grounds: (1) breach of an employment agreement; (2) breach of a non-compete agreement; (3) violation of C.G.S. § 31-72; (4) breach of agreement to lend; (5) breach of policy to extend warrants; (6) quantum meruit; and (7) breach of implied covenant of good faith and fair dealing. He has sued for multiple damages and has now moved for a prejudgment remedy on which a three day hearing was held.
The court accepts the plaintiff's characterization of the CT Page 6784 burdens and nature of the prejudgment remedy. The plaintiff need not prove his position by a preponderance of the evidence. All that is required is probable cause. On the other hand, it is quite clear that a court should determine the appropriateness of such a remedy not only on the basis of the credibility of the witnesses but also must make an "assessment of the legal issues."Greenberg, Rhein Margolis, Inc. v. Norris-Faye HortonEnterprises, Inc., 218 Conn. 162, 166 (1991).
For the purpose of the following discussion, the court, as will be indicated, will accept the factual allegations of the plaintiff but then has a responsibility to weigh these allegations against the legal claims made to determine the probable cause issue.
EMPLOYMENT CONTRACT
An issue in this case is whether on the date the plaintiff was terminated an employment contract existed between the plaintiff and the defendant company. There is no dispute that a written employment contract between the plaintiff as president and the corporation existed for a five year term from 1986 until December of 1991. The plaintiff was terminated at a meeting of the board on December 31, 1994. At the time of his termination there were three board members, the plaintiff, Mr. Narwold, and Mr. Firestone. At a board meeting on the last mentioned date Mr. Narwold and Mr. Firestone voted to terminate Mr. Volvovitz as president of the defendant company.
If the employment contract was in fact not renewed and no employment contract existed as of December 31, 1994 then the plaintiff, who was president of the company was an employee at will and could be terminated for any reason or no reason at all and he would not have a claim against the company under the employment contract.
Section 33-735 of the general statutes provides that all corporate powers shall be exercised by and under the authority of the board of directors. The employment of the president of a corporation is a unique management function entrusted to the authority of the board of directors of a corporation. A single director cannot exercise that power. Nelms v. A. A. LiquorStores, Inc., 445 S.W.2d 256, 259 (Tex. 1969), cf. Colish v.Brandywine Raceway Assoc., Inc., 119 A.2d 887, 890-92 (Del. 1995) 1812 Am.Jur.2d, Corporations, § 1500. CT Page 6785
How does a board of directors exercise its management authority?
 "A well established principle of corporate common law accepted by implication in the Model Act is that directors may only act at a meeting unless otherwise expressly authorized by statute. The underlying theory is that the consultation and exchange of views is an integral part of the functioning of the board", Model Business Corporation Act Annotated (3d ed, 1996), Volume 2, pp 8-108, 8-109.
See also statement of this rule in Laws of Corporations, Henn 
Alexander (1983), § 208, page 565; Volume 18B Am.Jur.2d, § 1447, page 334. As noted in Model Business Corporation Annotated, supra, a corollary of this rule is illustrated by a case like Greenbergv. Harrison, 143 Conn. 519 (1956) which held that directors must be physically present at board meetings and cannot vote by proxy,id. Page 523. That the common law principle is embedded in Connecticut corporation law is reflected by a statute like § 33-749 which provides that directors may act without a meeting but only if all directors so act and signed written consents are obtained from each director which detail the action to be taken. This statute was effective on January 1, 1997 but it is an elaboration of the policy set forth in the now repealed § 33-316 (d).
It has been pointed out that "courts have recognized the validity of informal directorial decisions, particularly in the context of closely held corporations", Model Business CorporationAnnotated (1996 Supp. ) At page 8-116. Thus there are exceptions to the general rule requiring formal board meetings.
One claim the plaintiff seeks to make here is that, even if his employment contract was not renewed at a meeting of the board of directors, there was informal directorial action approving the renewal of the contract which should be recognized as an exception to the general rule just discussed. For the purposes of the following discussion the court will take the plaintiff's factual testimony as established. Mr. Volvovitz testified that in the last quarter of 1991, before his employment contract expired in December of that year, a director, Mr. Finestone told him the CT Page 6786 employment contract was renewed by the company. He also testified that after the contract expired, Mr. Narwold, a director since March 1992, told him in December 1992 and again in December 1993 that he shouldn't worry about it, he was "covered" when Volvovitz asked whether the "oral renewal" of the employment contract should be memorialized in writing.
The court has great difficulty, given the facts of this case, in concluding that these statements by Finestone and Narworld would even satisfy the minimum requirements of that informal directorial decisional activity which would permit the exception to the general rule requiring board meetings to apply. In 1991, Mr. Sadow was a director. There is no testimony or indication what his position was on the Volvovitz employment contract and its renewal. Mr. Narwold wasn't even a director in the last quarter of 1991, and in 1992 and 1993, Mr. Sadow remained a director and Mr. Langione was a director. Neither of these gentlemen are said to have expressed any view or held any opinion about the existence of the employment contract when Mr. Narwold purportedly made these representations to the plaintiff in December 1992 and December 1993. Applying the exception to the common law rule of requiring director meetings under these circumstances would create a somewhat bizarre result. That is, § 33-749 would permit broad activity without a meeting only if all directors give their written consent and action under the section is effective only "when the last director signs the consent." Subsection (b). The repealed § 33-316 (d) also required all directors to consent. But under the exception advanced here, the corporation would be bound by informal non-meeting statements of less than all the directors and made at different times and when the composition of the board was different. In the court's opinion, this would carry the principle of informality too far; even in a small or closely held corporation, importance must be attached to full involvement by the directors in corporate activity. If the necessity of meetings is to be relaxed, there should at least be decisions by all the directors or all the directors should have knowledge of the proposed action — this at least would guarantee informal consultation or the opportunity for such consultation in lieu of the formal opportunity for consultation that scheduled general meetings provide.
But assuming the minimum predicate for an exception to the common law rule has been met, what do the cases require for the exception to apply? CT Page 6787
As noted, some courts dispense with the requirement of a formal meeting where a close corporation is involved. This makes sense, where the directors are the shareholders — the latter can ratify board action and the rules requiring formal board meetings with the need to take minutes and the opportunity given for shareholders to inform themselves by having such meetings are ultimately intended to protect shareholders. Thus, in Myhre v.Myhre, 554 P.2d 276, 282 (Mont., 1976), the directors and shareholders were the same individuals and the court held they could act without formal meetings. Also see, Remillong v.Schneider, 185 N.W.2d 493, 489 (N.D., 1971); Philadelphia LifeInsurance Co. v. Crossland-Cullen Co., 234 F.2d 780, 782 (CA., 4, 1956); In Re: Stylemaster Dept. Store, 154 N.Y.S.2d 58, 61
(1956); In Re: Kartub's Petition, 152 N.Y.S.2d 34, 35 (1956);Simonsen v. Helburn, 97 N.Y.S.2d 406, 409, 413 (1950); Ritz RealtyCorp. v. Eypper Beckman, Inc., 138 A. 900, 902 (N.J., 1927);Jordan v. Collins, 18 So. 137, 139 (Ak., 1895). See discussion at 18B Am.Jur.2d, Corporations, § 1449, page 336.
But this defendant corporation is not a closely held corporation as these cases use the term. The fact that a small corporation is involved or that for a portion of the critical time here Volvovitz was a majority shareholder and then owned a "substantial" minority portion of the shares does not make the defendant corporation a closely held corporation for purposes of the application of the exception to the common law rule requiring director action by formal board meetings. There is no identity of shareholders and directors, no indication that Volvovitz, Finestone and Sadow or any combination of them owned all the shares of this company when Finestone had his alleged conversation with Volvovitz in the last quarter of 1991. Similarly, there is no indication that Narwold, Volvovitz, Sadow and Langione owned all or even the large majority of the shares in December 1992 and December 1993 when Mr. Narwold made his representations to Mr. Volvovitz. Mr. Narwold indicated in his direct testimony that, prior to the plaintiff's termination in December 1994, he received complaints about how the company was operating. Mr. Narwold said at one point: "This company has about 250 shareholders. It is almost a de facto public company . . . ." (May 22, 1997 transcript, page 57). It is one thing to say that where the shareholders are in effect the directors the necessity for formal proceedings can be dispensed with; it is quite another thing to hold that where a corporation is not closely held as thus defined, directors can blithely and informally bind a corporation without a formal meeting in a conversation that may CT Page 6788 be completely casual and certainly unrecorded to the possible detriment of unknowing shareholders.
Furthermore, even if our state were to recognize the exception to the general rule in the case of closely held corporations and for some not readily apparent reason this corporation were found to be a closely held corporation, it seems to the court at least that there should be a qualification to the exception. Two courts seem to require that where the formal meeting requirement is dispensed with and a majority of directors can take corporate action, the other directors must at least have knowledge of the action about to be or in fact taken. Hurley v.Ornstein, 42 N.E.2d 273, 276 (Mass., 1942); Winchell v. PlywoodCorp., 85 N.E.2d 313, 316 (Mass., 1949). Here, as indicated, there is no evidence Sadow and Langione knew anything about Finestone's and Narwold's statements to Volvovitz.
(2)
The plaintiff also argues that the defendant corporation waived its right to use the lack of formal board approval to negate the existence of an employment contract "based on its history of acting informally and acquiescence in plaintiff's continued employment." The plaintiff relies on 18B Am.Jur.2d § 1450 which states in its opening comment:
 "A corporation or its stockholders may, by custom or general consent, waive the requirement of formal meetings of the board of directors. Courts have consistently held that the directors of a close corporation may transact the corporation's business affairs informally, especially where informality has become customary," id p. 337.
Of course there is no evidence here that the shareholders "by custom or general consent," waived formal board meetings. The plaintiff points to the informality of the procedures, however, of the board itself. It is noted that the employment contract at issue here which ran from 1986 to 1991 was not signed and ratified until a year and a half after there was a basic understanding as to its terms. That is hardly a precedent for the informal renewal of the contract since the point is the contract for the earlier period was eventually signed and ratified by the board. The corporation acting through the board thought that that CT Page 6789 degree of formality was required regarding its president's employment contract.
But the plaintiff refers to the minutes and notes that in other matters the corporation did not adhere to formalities — consulting contracts were signed with various parties and none of these contracts were apparently approved by the board, contracts with various employees are referenced in the minutes which never received formal board approval. The 1992 S-1 similarly refers to other contracts which never received formal board approval. Other examples are cited of contracts with outside entities that were never formally approved by the board.
As far as contracts with outside parties are concerned — who entered into these contracts on behalf of the corporation? Apparently corporate officers. Officers can be given broad powers to enter into operating contracts with outside entities by the by-laws or with the understanding or at the direction of the board, cf. § 33-764 of the general statutes, Kolodney v. KolodneyBros. Inc., 21 Conn. Sup. 308, 311 (1959). It has always been the law in this and other states that corporations would be subject to liability for contracts entered into by corporate officers who had the implied authority to do so where the corporation has received a benefit, Mahoney v. Hartford Investment Corp.,82 Conn. 280, 286 (1909), Linwood State Bank v. Lientz, et al.,413 S.W.2d 248, 253 (Mo. 1967), Morris v. Y B Corporation,153 S.E. 327, 332 (N.C., 1930).
As to contracts entered into with employees without formal board approval, assuming the by laws did not authorize officers to enter into such contracts and the board did not knowingly acquiesce in such contracts signed by its officers, there has to be a difference between the hiring of general employees and entering into contractural relations with the company president. Informality of hiring practices as to the former category can hardly be regarded as a recognition of a sanction of blanket informality in the hiring of a corporate president by means of offhand remarks of one director to another.
But there are two or more central problems to this waiver of consent theory. As the discussion in § 1450 of Am. Jur. at least implies, statutory provisions like the now repealed § 33-316 (d) and the present § 33-749 recognize the waiver exception to the general requirement that director action be taken at formal meetings. Neither of these statutes make exceptions for small or CT Page 6790 closely held corporation and they are flexible enough to accommodate their needs but both require that written consent ofall directors to proposed corporate action be obtained if formal meetings are to be dispensed with as a requirement. Given the existence of such statutes it is debatable whether courts should relax the requirement of formal director meetings especially where all the directors were not even aware of the particular act recognized as binding on the corporation based on a waiver theory. At least as to the consultation contracts, employment contracts, and contracts with outside entities previously referred to it could be said that the board was aware of them and apparently was willing to continue them in effect — they were in the minutes or 1988 or 1992 S-1 documents made available to the board. That cannot be said of the Finestone and Narwold conversations here — what did Sadow or Langione know? There is no mention in the minutes of an operative employment contract effective from 1991 to 1996 and the S-1 document which mentioned such a contract was only a draft prepared for a possible stock offering and was distributed as such, i.e. a draft.
Furthermore the § 1450 Am. Jur. discussion and many of the cases apply this waiver theory to closely held corporations; see for example the leading case of Baker v. Smith, 102 A. 721, 724
(R.I., 1918), cf. Bramar v. De La Montanya, 116 P.2d 66, 67, 70
(Cal., 1941), Leslie, Semple Garrison, Inc. v. Gairt L Co., Inc.,
439 N.Y.S.2d 707, 708, 709 (1981), Rowland v. Rowland, 633 P.2d 599,601, 605 (Ind., 1981). The court has the previously mentioned difficulty with defining this corporation as a closely held corporation; as regards the applicability of this waiver theory the court has the same difficulty.
(3)
The court recognizes promissory and equitable estoppel theory, see Restatement (Second) Contracts, § 90, O'Sullivan v.Bergenty, 214 Conn. 641, 647 (1990) but they have no applicability to this case. There is nothing to indicate Finestone or Narwold had any authority to bind the corporation under an estoppel theory. The corporation is an entity separate from its directors and if the plaintiff was misled he was misled by these individuals not by the corporation. Colish v. BrandywineRaceway Association, 119 A.2d 887, 890 (Del., 1955). Recognition of estoppel theories in this area would be tantamount to wholesale abandonment of the rule that directors may only act at formal meetings since the issue only arises when a director purports to CT Page 6791 act on his or her own. Something in the nature of an estoppel theory makes sense vis-a-vis claims by innocent third parties who have been induced to confer a benefit on a corporation by the implied authority of a director or officer — the corporation in such a situation should not be immune from suit. But such a theory has no place in intracorporate disputes[1]. Can a corporate president, also a director, who can be assumed to know the corporate law of this state, who himself recognized the possible wisdom of memorializing his own employment contract and who had the power at all times to put the subject on the agenda of a directors' meeting but did not, then sue the corporate entity because he claims to have relied on the assurances of a fellow director on the basis of rights he would have had if the contract had been approved by the board? The answer has to be no.
As part of his equitable estoppel argument, the plaintiff also argues that the December 1994 directors' meeting which terminated him was held by means of fraud and trickery. He was given the requisite 24 hour notice provided for in the bylaws but was not told of the purpose of the meeting. The plaintiff cites the Delaware case of Schroder v. Scotten, Dillon, Co.,
229 A.2d 4231, 434 (1972) where it says: "A special meeting held without due notice to all directors as required by the by-laws is not lawful and all acts done at such a meeting are void." ButSchroder is not this case; in Schroder a director did not receive notice that there would be a meeting and did not attend it. Id.
Page 435. Furthermore, pursuant to § 33-316 (a), which though repealed was operative in 1994: "Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the board of directors need be specified in the notice or waiver of notice of such meeting unless required by the bylaws or this chapter."
The action taken is not void and if the plaintiff was an employee at will in December of 1994 the manner in which he was terminated cannot be said to violate public policy as that concept has been defined in our law.
(4)
The plaintiff also argues that even if the court does not find for the plaintiff on any of the previously mentioned principles, the plaintiff should be awarded the balance of his contract based on the doctrine of wrongful termination. Torosyanv. Boehringer Ingelheim Pharmaceuticals, Inc., 234 Conn. 1, 14, CT Page 6792 15 (1995) is cited. That case recognizes contracts of permanent employment or for life are terminable at will but such contracts can be modified by the agreement of the parties. To show an implied employment agreement the plaintiff must show that "the employer had agreed, either by words or action or conduct, to undertake (some) form of actual contract commitment to him . . . ." The plaintiff argues that examples of such commitments are agreements that the employee may not be terminated without just cause and the employment agreement here provides that plaintiff could not be terminated but for cause — no one told him any differently. In Torosyan the basis for the implied contract finding were statements in an employment manual and by an interviewer who had apparent authority to make the plaintiff a job offer. Here we have three isolated statements made by two directors over a two year period that the plaintiff had an employment contract. This cannot constitute an "offer" to the employee by the corporation of an employment contract with the same terms as one that had already expired. Finestone's assurances were given before the old contract expired and Narwold's purported statements were made one and two years after it expired. The usual factors leading courts such as Torosyan to find implied contracts as an exception to the employment at will doctrine are absent. Cf. Avoiding and Defending WrongfulDischarge Claims, Vol. I, § 1.08, page 27. More to the point, we do not have here some worker or lower rank officer who has promises made to him by a job interviewer who the company has cloaked with the apparent authority to make representations about a job and representations in an employment manual. We have a president of a corporation who is also a director who must be presumed to be familiar with his bylaws and our state statutes that vest control of the corporation on the board of directors. He himself inquired of Mr. Narwold if the renewal of his contract should be memorialized by formal board action. For previously discussed reasons, the corporate entity should not be bound by statements of individual directors who had no authority to bind the corporation and who Mr. Volvovitz knew or should have known had no such authority.
An implied contract depends on actual agreement. Therrieu vSafeguard Mfg. Co., 180 Conn. 91, 94 (1980). There was no actual agreement by the corporate entity to renew the contract.
(5)
Neither is there any basis to conclude that Mr. Volvovitz had CT Page 6793 a contractual right to receive severance by way of express of implied contract. Representations at the board meeting where he was terminated that he would be paid severance do not rise to the level of a contractual commitment. The plaintiff testified that there was a policy and practice of severance but no mention of it is made in the employment contract nor was there any such representation made after his first contract expired to induce him to continue working. The plaintiff testified that all former employees received severance except three who were terminated for cause. But there was testimony that, as to two employees, the amount of their severance was negotiated. That leads to a problem the court has here with the issue of severance pay related to the mechanics of awarding a prejudgment remedy. It is true as to severance pay that if no actual agreement can be found between the parties a plaintiff may still be able to recover for breach of contract under promissory estoppel. Cf. D'Ulisse-Cupo v. Boardof Directors of Notre Dame High School, 202 Conn. 206, 211-212;Woolley v. Bank of Boston Connecticut, 12 Conn. L. Rptr. 127
(1994) and the later case did hold that severance pay is included under the provisions of § 31-76k of the General Statutes where a violation of § 31-72 is claimed. But how on earth do I determine the appropriate severance pay attachment amount? No formula has been presented to the court to permit it to arrive at any reasonable figure. It would be an odd interpretation of the due process concerns that lead to the requirement that hearings be given before prejudgment remedies are awarded which would then allow a court to arrive at a figure willy-nilly according to its own guess based on who knows what is an appropriate prejudgment award.
NON-COMPETE AGREEMENT
In 1984 the plaintiff and the company entered into a non-compete agreement. The plaintiff was terminated as president in December of 1994. The plaintiff first made a request for payment under the non-compete agreement on February 16, 1996. The plaintiff now claims that he is entitled to 14 months of payments until the notice was sent and for three months of payments thereafter.
Section 2.4.3 of the Non-Competition Agreement appears to govern this claim.
The construction and legal effect of a contract is for the court to decide. Bria v. St. Joseph's Hospital, 153 Conn. 626, CT Page 6794 632 (1966). In performing that function, contract language must be given its ordinary meaning unless a technical or special meaning is clearly intended. Central New Haven DevelopmentCorporation v. LaCrepe, Inc., 177 Conn. 212, 215 (1979). When contract language is clear, the meaning of the contract must be found in its content alone and the court cannot add further words. Porvel v. Burke, 178 Conn. 384, 388 (1979). A court must also accept the fact that parties ordinarily do not insert meaningless provisions or language in their contracts. A.M.Larson Co. v. Lawlor Ins. Agency, Inc., 153 Conn. 618, 622
(1966).
The first sentence of § 2.4.3 states that for a 24 month period after termination or expiration of his employment "the company shall pay to you (the plaintiff) each month" a sum which is to be determined by a formula set up in the language of the agreement. The section then goes on to state "[a]s a condition of your receipt of said amount you shall send a notice to the company stating that you have diligently sought employment (or more remunerative employment as the case may be) and setting forth the amount of your earnings (including deferred compensation) for the month in question." (Emphasis added.)
It appears to the court that the plain meaning of § 2.4.3 is that the plaintiff was entitled to receive certain payments "each month" under the formula set up in the section language. As a condition of his "receipt" of "said amount", i.e., this monthly payment, he had to send a notice to the company stating he diligently sought employment and the amount of his earnings. The American Heritage Dictionary defines "receipt" as "the act of receiving something." "Receive" is defined as "[t]o take or acquire (something given, offered or transmitted); get." To put it in the vernacular, to "get" the money each month he had to send in the notice each month; that was the "condition" of his "receipt" of the monthly payment. If no notice was sent in, what on earth could this language mean but that he in effect waived his right to receive the monthly payment? It is true that in the English language there is a difference between "accrual" of a right to receive and actual receipt but this contract does not speak in terms of accrual but in terms of the receipt of a monthly payment. To say this is a "technical" defense really is an argument difficult to put weight on; similarly, the argument that the defendant's position is a "sham" because it continued to demand compliance with the non-compete agreement appears to miss the point. Section 2.4.1 indicates the non-competition agreement CT Page 6795 shall remain in effect for 24 months subject to the company's compliance with § 2.4.3. But the company's compliance under the terms of § 2.4.3 was meant to be triggered by the plaintiff's sending notice as provided for in the section's language. In other words, for a 24 month period the plaintiff was obligated to comply with the agreement even if he could not truthfully represent he was diligently seeking employment or had received any earnings. If the right to receive monies under the non-compete agreement accrues without the need to send in monthly notices, why was there a requirement that such notices be sent in? This company obviously has a reason to monitor the plaintiff's activity on a monthly basis so it could have the payment formula fairly applied rather than face a claim for accrued benefits based on a claim for large sums which might not be made for months.
Frankly, the difficulty with the plaintiff's position lies in the somewhat inartful language of the last sentence of § 2.4.3 which says: "If at any time the company elects not to make additional monthly payments under this section (which it shall have the right to do on three month's notice), you shall thereafter be free of the restrictions in section 2.4.1." If no payments at all were ever made, what could "additional" refer to? The only way the court can make sense of this language is to say that the right to monthly payments must be initiated by the plaintiff's sending in the specified notice. The monthly notice required has a retroactive application as to any particular month. Therefore, notice can be sent any time within the 24 month period. Upon § 2.4.3 notice being sent, the plaintiff would be entitled to that one month payment triggered by the notice. If the company, as it did here, chooses not to make additional payments to that one monthly payment the plaintiff would be entitled to, then it shall give the plaintiff the appropriate notice but as long as he gives the appropriate monthly notice for receipt of his payment for any particular month, he is entitled to three more months of payment. This interpretation does less violence to the apparent intent of the parties than an "accrual" interpretation that reads out the notice requirement from the contract or the defendant's interpretation which under the circumstances of this case would defeat any right to a monthly payment for notice when sent at some time after the 24 month period following the termination commenced. Pursuant to this view, the plaintiff then, in the court's opinion, is entitled to four months' payment under the non-compete agreement. CT Page 6796
The defendant had been earning $210,000 per year or $17,500 a month. His earnings during the period in question were nothing. So based on the 75% formula in § 2.4.3, there would be an entitlement to $13,125 per month. The four month total would be $52,500.
The defendant has not convinced the court that Mr. Volvovitz showed lack of diligence in pursuing his business endeavors. The testimony indicated that economic times were bad for the type of companies involved here so the fact that Mr. Volvovitz earned no income does not indicate lack of effort on his part to do so at least for prejudgment remedy purposes. An increased award for bad faith or unreasonable conduct by the company concerning this claim, however, is not warranted based on the court's interpretation of the contractural rights of this agreement.
Extension of Warrants
There is a conflict of testimony on past practices by this company regarding the extension of warrants — or options to buy the company's stock at a set price. Mr. Volvovitz claims that his warrants would have been extended but for his termination and the only warrants not extended were those where a request was not made and the holder decided to allow them to lapse. Accepting this as true the point remains that extension of warrants is a gratuitous act by the board of directors that ought to be made in the board's exercise of its fiduciary responsibility. Thus warrants can be extended to reward employees or attract investors as was done here. When the warrants were issued here, Mr. Volvovitz was president. He was terminated from that position. The court cannot determine what if any portion of the warrants ought or would have been extended by the board following prior policy and given Mr. Volvovitz new status of not being president.
This is further related to a problem the court has of the valuation of $1 per warrant put on these warrants by the plaintiff. A plaintiff can testify I suppose to the value of his own property. The basis of the rule is that it reflects the difficulty of procuring other witnesses having knowledge on which to base an opinion especially for example where stolen items are involved and the common experience that owners are familiar with their property and know its worth. State v. Baker, 182 Conn. 52,60 (1980). This reasoning breaks down somewhat since with stock warrants their value depends on future variables and volatility of the stock which Mr. Volvovitz himself testified about. There CT Page 6797 is in fact some support in the case law for the proposition that where an owner is allowed to testify about the value of his or her property "the property must be of a common, usual and ordinary nature in order to make the owner's testimony admissible," 31 Am. Jur., Expert and Opinion Evidence § 320, page 315, see cases at footnote 30 and article at 37 ALR 2d 967, § 7. Where a warrant is priced higher than its current trading price, its future value is speculative by Mr. Volvovitz own testimony and no testimony was presented to indicate that his valuation of $1 per share is anything more than rank speculation based on future imponderables.
Mr. Volvovitz provided no testimony as to how he arrived at a value for these warrants on the basis of any familiarity with the value of such warrants. It is incumbent on a plaintiff in a prejudgment proceeding to satisfy the court as to the reasonable value of his or her damage claim, Essex Group Inc. v. DucciElectric Co., 181 Conn. 524, 525 (1980), Mullai v. Mullai,1 Conn. App. 93, 94 (1983). The court concludes no prejudgment remedy is appropriate based on the legal merits of the claim in light of the evidence presented and also based on its inability to ascertain damages.
Loan
The court does not believe a prejudgment remedy is justified based upon the value of the agreement to make a loan by the company which the plaintiff claims was promised to him as part of his compensation. The court cannot place a value on this loan. It was never exercised and the court has no idea how valuable this loan was or access to such a loan would be under its terms since no evidence was introduced as to the price of credit at the time of the hearing or at any earlier time when Mr. Volvovitz could have exercised any rights he might have had to take advantage of the loan.
The Court will only award a prejudgment remedy on the amount of $52,500 based on its interpretation of the plaintiff's rights under the noncompetition agreement.
CORRADINO, J.