**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| LORENZO ROCCIA and TRANSATLANTIC GROUP PARTNERS, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2020-0641-MTZ |
| MARTIN MUGICA and ULTINER LLC, | ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| SKYLINE RENEWABLES, LLC | ) ) | |
| Nominal Defendant. | ) | |

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' <u>MOTION FOR SUMMARY JUDGMENT</u>**

WHEREAS, on review of Plaintiffs' motion for summary judgment ("Plaintiffs' Motion") and Defendants' cross-motion for summary judgment ("Defendants' Motion"), as briefed and taken under advisement on November 6, 2020, it appears:[1]

---

[1] Citations in the form of "PX — at —" refer to the exhibits attached to the Transmittal Declaration of Bruce E. Jameson, available at Docket Item ("D.I.") 37. Citations in the form of "DX — at —" refer to the exhibits attached to the Unsworn Declaration of Martin Mugica, available at D.I. 34.

A.    This dispute centers on three entities nested like matryoshka dolls.[2] The innermost doll is Nominal Defendant Skyline Renewables LLC ("Skyline"), an investment company through which its owners invest in renewable energy ventures.[3] It is nested within Transatlantic Power Holdings LLC ("Holdings"), which owns 100% of Skyline's non-voting Class B shares and 0.5% of its Class A voting shares.[4] Holdings is managed and controlled by its managing member, the outermost doll, Transatlantic Ultiner LLC ("Managing Member").[5] Managing Member's ownership is split evenly between Plaintiff Lorenzo Roccia, through his entity Transatlantic Group Partners LLC ("Transatlantic," and together with Roccia, "Plaintiffs"), and Defendant Martin Mugica, through his entity Ultiner LLC ("Ultiner," and together with Mugica, "Defendants").[6]

B.    Skyline, Holdings, and Managing Member are governed by a similarly nested set of operating agreements (the "Skyline Operating Agreement," the

---

[2] Matryoshka dolls, often called Russian nesting dolls, are a popular form of folk art, wherein successively smaller wooden dolls are arranged inside one another.

[3] *See* D.I. 40 ¶ 3 [hereinafter "Am. Answer"].

[4] *See* PX 4 [hereinafter "Skyline Op. Agr."], Schedule I. Nonparty Windpower Americas I LLC ("Windpower I") owns the other 99.5% of Skyline's Class A shares. *Id.* Windpower I is a controlled subsidiary of Ardian, a French private equity firm. *See* Am. Answer ¶ 23.

[5] Am. Answer ¶ 21. Managing Member owns a 75.8% voting interest in Holdings. *Id.* ¶ 21; PX 1 [hereinafter "Holdings Op. Agr."], Schedule A. Eight other nonparty investors hold the remaining 24.2% interest, and vote only in certain strategic transactions. *See* Holdings Op. Agr., Schedule A; *id.* § 4.06(a)(ii)–(b).

[6] Am. Answer ¶¶ 18–20.

"Holdings Operating Agreement," and the "Managing Member Operating Agreement," respectively). The Skyline Operating Agreement establishes a corporation-like management structure for Skyline, with a CEO and a five-member board of managers (the "Skyline Board").[7] The Skyline Board has two managers appointed by Holdings and three appointed by Skyline's other investor, Windpower I.[8] The Skyline Operating Agreement also delegates certain authority to its asset manager, Holdings.[9] Holdings similarly has a corporation-like management structure, with a CEO and a four-member board of managers (the "Holdings Board") directing its affairs. Holdings also delegates certain authority to its managing member, Managing Member.[10] Managing Member, in turn, is run by its two-member board of managers (the "Managing Member Board").

C.    Roccia and Mugica have management roles in each entity. The two men are Holdings' designees on the Skyline Board.[11] Roccia is the Skyline Board's

---

[7] *See* Skyline Op. Agr. § 7.1(a)–(f). Skyline is a series LLC; for the purposes of this Order, I refer to all Skyline entities as "Skyline" and all those entities boards' as the "Skyline Board."

[8] *See id.* § 7.1(e)–(f); *see also id.*, Schedule I.

[9] *See id.* § 1.1 (defining Holdings as Skyline's "Asset Manager"); *see also* DX 8 [hereinafter "Asset Manager Agr."]. Holdings, as Skyline's Asset Manager was responsible for directing certain aspects of Skyline's day-to-day business. *See, e.g.*, Skyline Op. Agr. §§ 5.1–5.2, 8.3(e); *see also* Asset Manager Agr. § 2.1.

[10] *See, e.g.*, Holdings Op. Agr. § 12.02(a) (appointing Managing Member as Holdings' "Tax Matters Member").

[11] *See* Skyline Op. Agr. § 7.1(f).

chairman;[12] Mugica is Skyline's President and CEO.[13] They have the same roles at the Holdings level: both Mugica and Roccia are members of the Holdings Board, Roccia is the Holdings Board's chairman, and Mugica is President and CEO.[14] And at the Managing Member level, Roccia and Mugica are the only two members of the Managing Member Board.[15]

D.    This action concerns Mugica's attempt, in his role as Holdings' President and CEO, to remove Roccia from the Skyline Board. On May 11, 2020, Mugica wrote Roccia, the Skyline Board members, and the Holdings Board members (the "Removal Letter"):

> Pursuant to my authority as President and CEO of Transatlantic Power Holdings LLC (the "Company"), this letter serves as notice that Lorenzo Roccia is hereby removed, effective immediately, as a member of the Board of Managers of Skyline Renewables LLC and as a member of the Board of Managers of Skyline Renewables LLC - Series 1.
>
> Mr. Roccia's removals are made in accordance with Section 7.6(a) of the Amended and Restated Operating Agreement of Skyline Renewables LLC dated effective as of February 23, 2018 (the "Operating Agreement"). Pursuant to Section 7.1(f) of the Operating Agreement, I will in the near future appoint a replacement for Mr. Roccia on both Boards as one of the Company's two permitted representatives.[16]

---

[12] *Id.* § 7.2(a).

[13] *Id.* § 7.7(a).

[14] Holdings Op. Agr. § 8.02. There are two other members of the Holdings Board, Abel Navarro and a fourth director to be appointed by Managing Member. *Id.*

[15] Managing Member Op. Agr. § 6.02.

[16] PX 6.

4

The parties dispute whether Roccia's removals were valid and proper.

E.     On July 31, 2020, Plaintiffs filed their first complaint under 6 *Del. C.* § 18-110, seeking an injunction preventing Roccia's removal from the Skyline Board, a declaration that his purported removal was void, and attorneys' fees pursuant to the Skyline Operating Agreement.[17]  Defendants answered the first complaint on September 2.[18]

F.     The parties agreed to present this matter to the Court through cross-motions for summary judgment,[19] which they filed simultaneously on October 23.[20] Also on October 23, Plaintiffs filed their amended complaint,[21] which Defendants answered on October 28.[22]  The parties stipulated that the amended pleadings would govern the cross motions for summary judgment.[23]  Plaintiffs' Motion requests the Court "declare the purported removal of Roccia from the Skyline Board as void *ab initio*, and award to Plaintiffs their reasonable fees and expenses in prosecuting this

---

[17] D.I. 1 at 26.

[18] D.I. 17 at 1.

[19] D.I. 20 at 1.

[20] D.I. 39; D.I. 35; *see also* D.I. 32; D.I. 36.

[21] D.I. 31 at 1.

[22] Am. Answer at 1.

[23] D.I. 30 ¶ 3.  Counsel is commended for narrowing the issues for the Court's consideration and presenting them concisely.

action."[24] Defendants argue that Mugica's removal of Roccia was valid and binding on Holdings.

G. The Motions present two questions of contract interpretation. First, under the relevant agreements, may Holdings remove Roccia from the Skyline Board? And, if so, does Mugica have the authority to exercise that power himself by virtue of his position as Holdings' President and CEO, as defined by the Holdings Operating Agreement and Mugica's employment agreement (the "Employment Agreement")?

H. Delaware LLCs are creatures of contract.[25] "In governance disputes among constituencies in an LLC, the starting (and end) point almost always is the parties' bargained-for operating agreement, and the court's role in these disputes is to 'interpret [the] contract [and] effectuate the parties' intent.'"[26] In interpreting LLC agreements, Delaware courts treat them as any other contract,[27] aiming to "give priority to the parties' intentions as reflected in the four corners of the agreement,

---

[24] D.I. 36 at 34.

[25] *E.g.*, *TravelCenters of Am., LLC v. Brog*, 2008 WL 1746987, at *1 (Del. Ch. Apr. 3, 2008).

[26] *A & J Cap., Inc. v. L. Office of Krug*, 2018 WL 3471562, at *5 (Del. Ch. July 18, 2018) (alterations in original) (quoting *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *7 (Del. Ch. June 21, 2012)).

[27] *See Mickman v. Am. Int'l Processing, L.L.C.*, 2009 WL 2244608, at *2 (Del. Ch. July 28, 2009).

construing the agreement as a whole and giving effect to all its provisions."[28]

"Delaware adheres to the objective theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party."[29] In doing so, the Court will "give effect to the plain-meaning of the contract's terms and provisions,"[30] will "read a contract as a whole and . . . will give each provision and term effect, so as not to render any part of the contract mere surplusage."[31] "If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."[32]

I.   The foregoing principles guide the Court's interpretation of both the relevant LLC operating agreements and the Employment Agreement. Pursuant to the Holdings Operating Agreement, the Holdings Board has full power over all of Holdings' affairs, including the "full and complete" authority to act "on behalf of and in the name of the Company":

---

[28] *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (internal quotation marks omitted) (quoting *GMG Cap. Inv., LLC. v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[29] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (footnotes and internal quotation marks omitted) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

[30] *Id.* at 1159–60; *see also Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) ("Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning.").

[31] *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010).

[32] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

The business and affairs of the Company shall be managed, operated and controlled by or under the direction of the Board, and the Board shall have, and is hereby granted, the full and complete power, authority and discretion for, on behalf of and in the name of the Company, to take such actions as it may in its sole discretion deem necessary or advisable to carry out any and all of the objectives and purposes of the Company, subject only to the terms of this Agreement.[33]

The Holdings Board delegated only a subset of that authority to Mugica, and retained the power to alter the scope of that delegation.[34]

J. The Employment Agreement characterizes Mugica's powers and duties as those of a chief executive:

During the Employment Term, [Mugica] shall serve as the Executive Officer of the Company, reporting to the [Holdings Board]. In such position, [Mugica] shall have such customary and usual duties, authority and responsibility as chief executive, as shall be further determined from time to time by the Board, which duties, authority and responsibility are consistent with [Mugica's] position. Notwithstanding the foregoing, unless and until changed or revised by the [Holdings Board], [Mugica's] duties and powers shall include the duties, powers and limitations described on the attached Exhibit A.[35]

---

[33] Holdings Op. Agr. § 8.01.

[34] *See* Holdings Op. Agr. § 8.09 ("Subject to the ultimate control of the [Holdings Board], [Mugica] shall have . . . such other powers and duties as may be prescribed or granted by the [Holdings Board]."); PX 3 [hereinafter "Empl. Agr."], Ex. A (same); *see also* Empl. Agr. § 2.1 ("Notwithstanding the foregoing, unless and until changed or revised by the [Holdings Board], [Mugica's] duties and powers shall include the duties, powers and limitations described on the attached Exhibit A.").

[35] Empl. Agr. § 2.1.

Exhibit A to the Employment Agreement further explains these duties, emphasizing

Mugica's broad authority to supervise and control Holdings' "business and

operations":

> Subject to the ultimate control of the [Holdings Board], [Mugica] shall have paramount and full responsibility and power for the general supervision, direction and control of the business and operations of [Holdings] and the officers and employees of [Holdings], and shall have all of the general powers of management usually or typically vested in the office of president of a corporation, and shall have such other powers and duties as may be prescribed or granted by the [Holdings Board].[36]

Section 8.09 of the Holdings Operating Agreement largely echoes the "paramount

and full responsibility" language from Exhibit A:

> Subject to the ultimate control of the [Holdings Board] and other limitations set forth in this Agreement, the President and Chief Executive Officer shall have paramount and full responsibility and power for the general supervision, direction and control of the business and operations of [Holdings] and the Officers and employees of [Holdings], and shall have all of the general powers of management usually or typically vested in the office of president of a corporation, and shall have such other powers and duties as may be prescribed or granted by the [Holdings Board].[37]

---

[36] *Id.* Ex. A.

[37] Holdings Op. Agr. § 8.09.

K.      The proper interpretation of such contract language is a question of law, making it well-suited for resolution on a motion for summary judgment.[38] The summary judgment standard is familiar:

> Summary judgment is appropriate when the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." On a motion for summary judgment, "the moving party bears the burden of establishing that there are no issues of material fact, and the court must review all evidence in the light most favorable to the non-moving party."[39]

**IT IS HEREBY ORDERED**, this 29th day of December, 2020, that:

1.      Mugica's purported ouster of Roccia was ineffective because Mugica did not have the authority to remove Roccia from the Skyline Board on Holdings' behalf. Based on the plain meaning of Mugica's Employment Agreement and the Holdings Operating Agreement, Holdings did not empower Mugica to act on Holdings' behalf to remove a director of an affiliated entity.

2.      It is unnecessary to determine whether the Skyline Operating Agreement granted Holdings the power to remove Roccia from the Skyline Board in the first instance; this Order assumes it did. Under Section 7.6 of the Skyline

---

[38] *E.g.*, *The Williams Cos. v. Energy Transfer LP*, 2020 WL 3581095, at *11 (Del. Ch. July 2, 2020) ("Contract interpretation is often amenable to summary judgment because the interpretation of a contract is a question of law. Generally, only in ambiguous contracts where the contractual language is fairly susceptible to different interpretations is summary judgment improper." (internal quotation marks, alterations, and footnotes omitted)).

[39] *Weil v. VEREIT Operating P'ship, L.P.*, 2018 WL 834428, at *3 (Del. Ch. Feb. 13, 2018) (internal citations and alterations omitted).

10

Operating Agreement, the provision under which Mugica purported to remove Roccia,[40] the power to remove a manager from the Skyline Board rested with Holdings, as the member who appointed him.[41] The relevant question here is whether Holdings delegated that power to Mugica.

3.  Holdings could delegate to Mugica any or all of the powers and duties to manage and control its business and affairs.[42] As it happened, Holdings granted plenary power to its board, and only limited authority to Mugica, as president and CEO, analogized to the authority held by a corporate officer in the same position.[43]

4.  In view of this corporation-like hierarchy, I look to Holdings' specific delegations of power to Mugica as CEO to determine the scope of his authority.[44]

---

[40] *See* PX 6.

[41] *See* Skyline Op. Agr. § 7.6.

[42] *See* 6 *Del. C.* § 18-407 ("Unless otherwise provided in the limited liability company agreement, a member or manager of a limited liability company has the power and authority to delegate to 1 or more other persons any or all of the member's or manager's, as the case may be, rights, powers and duties to manage and control the business and affairs of the limited liability company.  Any such delegation may be to agents, officers and employees of a member or manager or the limited liability company, and by a management agreement or another agreement with, or otherwise to, other persons.").

[43] *See* Empl. Agr. § 2.1 ("In such position, [Mugica] shall have such customary and usual duties, authority and responsibility as chief executive . . . ."); Empl. Agr. Ex. A. ("[Mugica] . . . shall have all of the general powers of management usually or typically vested in the office of president of a corporation . . . ."); Holdings Op. Agr. § 8.09 ("[T]he President and Chief Executive Officer . . . shall have all of the general powers of management usually or typically vested in the office of president of a corporation . . . .").

[44] *See Obeid v. Hogan*, 2016 WL 3356851, at *6 (Del. Ch. June 10, 2016).

In a corporation, an officer's authority is limited to the authority the board grants her; the board holds plenary authority.[45] In general, a corporate officer is an agent who may bind the company, her principal, only when she has authority to do so.[46]

---

[45] *See Joseph Greenspon's Sons Iron & Steel Co. v. Pecos Valley Gas Co.*, 156 A. 350, 351–52 (Del. Super. Ct. 1931) ("The powers of a President of a corporation, i.e., the powers over its business and property, are, of course, merely the powers of an agent, for a corporation can speak in no other manner. The control over the company's business and property is vested in the Board of Directors, but subject to this control certain powers are delegated by implication to certain officers."); *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 780–81 (Del. Ch. 2016) ("Officers also are agents who report to the board of directors in its capacity as the governing body for the corporation. The General Corporation Law of the State of Delaware . . . and the decisions of [the Delaware Supreme] Court have repeatedly recognized the fundamental principle that the management of the business and affairs of a Delaware corporation is entrusted to its directors, who are the duly elected and authorized representatives of the stockholders. Within this relationship, officers have a duty to comply with the board's directives." (internal citations, footnotes, and quotation marks omitted)), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019); *Kleinberg v. Cohen*, 2017 WL 568342, at *13 (Del. Ch. Feb. 13, 2017) ("In a Delaware corporation, the directors of the corporation manage the corporation and that principle is statutorily enshrined in Section 141(a). A written contract allowing board appointment rights cannot be used to thwart that precept of Delaware law."); *OptimisCorp. v. Waite*, 2015 WL 5147038, at *66 (Del. Ch. Aug. 25, 2015) (discussing "the fundamental premise of Delaware law that a corporation is managed by the board of directors" and affirming that "[i]n a Delaware corporation, the directors of the corporation manage the corporation and that principle is statutorily enshrined in Section 141(a)"); *Klaassen v. Allegro Dev. Corp.*, 2013 WL 5967028, at *15 (Del. Ch. Nov. 7, 2013) ("Often it is said that a board's most important task is to hire, monitor, and fire the CEO." (citing authorities)).

[46] *Petition of Mulco Prods., Inc.*, 123 A.2d 95, 103–04 (Del. Super. Ct. 1956) ("It is axiomatic that a corporation by structural necessity must act, if it acts at all, through its agents. Consequently in any situation where the power of an agent to bind his principal is put in issue, the agent's authority becomes a matter of paramount importance. The authority of an agent may fall generally into two categories, actual and apparent. . . . The issue of actual authority, whether express or implied, is decided solely by scrutinizing the relationship of the agent and the corporation." (internal citations omitted)), *aff'd sub nom. Mulco Prods., Inc. v. Black*, 127 A.2d 851 (Del. 1956). In this case, Mugica relies only on his authority under the relevant agreements.

12

5.      Holdings delegated four branches of authority to Mugica: (1) "the general powers of management usually or typically vested in the office of president of a corporation," (2) control of Holdings' "business and operations," (3) control over Holdings' "officers and employees," and (4) other duties as assigned by the Holdings Board.[47] By their plain meaning, none of these four categories gave Mugica authority to exercise the company's removal rights for directors of affiliated companies.[48]

6.      I first consider Mugica's "general powers of management usually or typically vested in the office of president of a corporation." This Court has recognized that a corporate president has certain authority inherent to her office.

> The strict rule that the president of a private corporation has little or no authority to bind the corporation by virtue of his office is slowly but certainly giving place to the more reasonable and practical view that he is presumed to have, by virtue of his office, certain more or less limited powers in the transaction of the usual and ordinary business of the corporation.[49]

---

[47] Empl. Agr. Ex. A.

[48] *Cf. Ensing v. Ensing*, 2017 WL 880884, at *9–10 (Del. Ch. March 6, 2017) (finding that defendant's purported removal of an LLC's manager was ineffective because he was not authorized to act on behalf of the LLC's members).

[49] *See Italo-Petroleum Corp. of Am. v. Hannigan*, 14 A.2d 401, 406 (Del. 1940) (citing *Atl. Refin. Co. v. Ingalls & Co.*, 185 A. 885, 886 (Del. Super. Ct. 1936)); *see also Joseph Greenspon's Sons Iron & Steel Co.*, 156 A. at 352.

Thus, by giving Mugica the powers of a president of a corporation, Holdings gave him only the authority to bind the company in the ordinary course of business.[50]

7.　　Mugica's power as Holdings' president and CEO does not include the ability to exercise Holding's removal rights in Skyline. Removing a director of an affiliated company is neither "usual and ordinary" nor part of Holdings' core business. Removing a director is an exercise of Holdings' membership rights under the Skyline Operating Agreement.[51] Doing so is inherently an extraordinary event, outside of Holdings' ordinary business.[52] Further, Holdings' "usual and ordinary business" is, as described in the Holdings Operating Agreement, "identifying, acquiring . . . developing, building, operating and managing" its various renewable energy assets.[53] These day-to-day operations do not encompass removing its

---

[50] *See Italo-Petroleum*, 14 A.2d at 406; *Colish v. Brandywine Raceway Ass'n*, 119 A.2d 887, 891 (Del. Super. Ct. 1955) ("The rule mentioned in [*Italo-Petroleum*] to the effect that the president of a private corporation is presumed to have, by virtue of his office, certain more or less limited powers in the transaction of the usual and ordinary business of the corporation, is not applicable here because this particular transaction was not in the ordinary course of defendant's business."); *see also Rainbow Mountain, Inc. v. Begeman*, 2019 WL 6724420, at *2 (Del. Ch. Dec. 5, 2019). A corporate president may also be delegated authority beyond what is "inherent" to her office. I discuss Mugica's authority under other, more specific, delegations of power *infra*.

[51] *See* Skyline Op. Agr. § 7.6(a).

[52] Removing a director of a Delaware corporation is a significant action that is protected by statute. *See* 8 *Del. C.* § 141(k); *see also Solstice Cap. II, L.P. v. Ritz*, 2004 WL 765939, at *1 & n.13 (Del. Ch. Apr. 6, 2004).

[53] Holdings Op. Agr. § 4.06(b)(ii) (defining Holdings' "Business" as "identifying, acquiring (and disposing of), developing, building, operating and managing principally wind and solar energy assets . . . including power plants and electrical facilities and

14

designees on other companies' boards.  Exercising Holdings' removal right in Skyline is outside the scope of Mugica's authority as a "typical" corporate president.[54]

8.  The second category of Mugica's authority similarly does not reach removing Roccia.  Mugica's "paramount and full responsibility and power for the general supervision, direction and control of the business and operations of [Holdings]" empowers him to supervise the company's commercial enterprise and activities.[55]  As explained, Holdings' commercial activities include "identifying, acquiring . . . developing, building, operating and managing" renewable energy assets.[56]  Exhibit A to Mugica's Employment Agreement emphasizes that his power is focused on operational matters, namely, execution of the annual budget and business plan (the "Annual Budget Plan").[57]

9.  In *Miramar Police Officers Retirement Plan v. Murdoch*, this Court interpreted the meaning of the term "business and operations" in a separation and

---

providing all related services including but not limited to energy trading, asset management and optimization within North America."); *see Italo-Petroleum*, 14 A.2d at 406.

[54] *See* Empl. Agr. Ex. A.

[55] *See Miramar Police Officers' Ret. Plan v. Murdoch*, 2015 WL 1593745, at \*12–13 (Del. Ch. Apr. 7, 2015).

[56] Holdings Op. Agr. § 4.06(b)(ii).  Even though Holdings is, broadly speaking, a holding company, the company's "Business" as defined in its LLC agreement is operational.

[57] *See* Empl. Agr. Ex. A.

distribution agreement.[58] There, the Court considered whether certain governance restrictions from a settlement agreement had transferred in a spin-off transaction.[59] That question was ultimately governed by the agreement's use of the phrase "business and operations."[60] The *Murdoch* Court, relying on "commonly used dictionaries," found that "the word 'business' means the commercial enterprise of a company, and the word 'operations' means the commercial activities of a company."[61] The Court distinguished these commercial activities from "corporate governance matters."[62]

10.    Consistent with this interpretation, I conclude that Mugica's authority over Holdings' "business and operations" does not empower him to speak for the company regarding Roccia's position on the Skyline Board. Mugica's "paramount and full responsibility and power" is over the company's commercial enterprise and activities.[63] As explained, this purview does not include exercising Holdings' removal rights in Skyline.[64] This interpretation is consistent with *Murdoch*'s

---

[58] *Murdoch*, 2015 WL 1593745, at *11–12.

[59] *See id.* at *1.

[60] *See id.* at *11–12.

[61] *See id.* at *12.

[62] *See id.* at *12–13.

[63] *See id.* at *12.

[64] In an attempt to bring Roccia's removal within Holdings' operations, Defendants contend that Mugica sought to remove Roccia because Roccia opposed Mugica's execution

16

interpretation of the phrase "business and operations," and the Holdings Operating Agreement's plain language.

11. Nor does Mugica's authority over Holdings' "officers and employees" give him authority him to remove Roccia from the Skyline Board. Holdings' designees on the boards of affiliated entities are neither officers nor employees of Holdings, but rather, are managers of the affiliates. Because Holdings' designees on the Skyline Board are not officers or employees of Holdings, that branch of Mugica's power does not reach them.

12. Finally, Mugica also has "such other powers and duties as may be prescribed or granted by the [Holdings Board].[65] There is no evidence that the Holdings Board otherwise delegated to Mugica authority by which he could exercise the company's removal power.

13. Neither of Mugica's arguments supports a broader understanding of his power. First, Mugica argues that the ten enumerated restrictions in Exhibit A of his Employment Agreement are the only limitations on his otherwise absolute power at

---

of the Annual Budget Plan at the Skyline Board level. *See* D.I. 32 at 40. Defendants' reading would dramatically expand Mugica's delegated authority beyond operational matters. That removing Roccia would allow Mugica to operate Holdings as he sees fit does not transform Roccia's removal into an operational issue.

[65] Empl. Agr. Ex. A.

Holdings.[66] Exhibit A prohibits Mugica from taking certain specific operational actions without prior written approval from the Holdings Board, "unless contemplated under, consistent with and pre-approved in the Annual Budget Plan."[67] But Mugica's power is fundamentally constrained to matters involving Holdings' "business and operations," as described above. The items listed in Exhibit A are limits on that delegated authority, not a grant of plenary authority.

14.     Second, Mugica argues that the Holdings Board agreed to use "commercially reasonable efforts" to avoid involving itself in his operational duties.

> Except in extraordinary circumstances (as may be determined by the Board, acting in good faith), the Board will use commercially reasonable efforts to refrain from involving itself with or directing the Executive's discharge of his duties and responsibilities on behalf of the Company so long as such discharge of his duties and responsibilities are consistent with the [Annual Budget Plan].[68]

This language does not broaden Mugica's authority. It is, at most, a promise that the Board will not interfere with Mugica's delegated powers under the Employment Agreement, namely, those outlined in Section 2.1 and Exhibit A. It is not itself an

---

[66] *See* D.I. 42 at 20. Defendants also cite extrinsic evidence about the parties' intentions, including emails exchanged during drafting, in support of their broad reading. Mugica contends these exhibits support his interpretation of Exhibit A as the only "carve outs" to his otherwise broad power. *See, e.g.*, *id.* (quoting DX 3). The Court cannot use extrinsic evidence to interpret an unambiguous contract. *See Eagle Indus.*, 702 A.2d at 1232. Because the Holdings Operating Agreement and the Employment Agreement are not ambiguous, I do not consider that evidence.

[67] Empl. Agr. Ex. A.

[68] *Id.*

independent grant of power. The Holdings Board's promise not to interfere does not expand Mugica's power to an area not contemplated by the agreements.

15. Section 15.15 of the Holdings Operation Agreement permits the prevailing party to recover attorneys' fees expended in an action related to that agreement:

> **Attorneys' Fees.** In the event that any party hereto institutes any legal suit, action or proceeding, including arbitration, against another party in respect of a matter arising out of or relating to this Agreement, the prevailing party in the suit, action or proceeding shall be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by such party in conducting the suit, action or proceeding, including reasonable attorneys' fees and expenses and court costs.[69]

The parties do not dispute that this action is "a matter arising out of or relating to this Agreement," as both Plaintiffs and Defendants have requested the Court to shift fees under this provision.[70] As the prevailing party, Plaintiffs are entitled to their reasonable attorneys' fees and expenses incurred in this action. The parties shall confer regarding the amount of Plaintiffs' expense award. If the parties cannot agree on the amount, then Plaintiffs shall file a motion supported by a Court of Chancery Rule 88 affidavit.

---

[69] Holdings Op. Agr. § 15.15.

[70] *E.g.*, D.I. 42 at 32; D.I. 36 at 33.

19

16. For the foregoing reasons, Plaintiffs' Motion is **GRANTED**. Accordingly, and for the same reasons, Defendants' Motion is **DENIED**. Within twenty days, the parties shall submit an implementing order reflecting this decision if a fee award is agreed upon; otherwise, Plaintiffs shall file their motion.

*/s/ Morgan T. Zurn*
Vice Chancellor Morgan T. Zurn